693 F.2d 1243
 12 Fed. R. Evid. Serv. 340
 David Leroy WASHINGTON, Petitioner-Appellant,
v.
Charles E. STRICKLAND, Superintendent, Florida State Prison,
Jim Smith, Attorney General of the State of Florida, and
Louie L. Wainwright, Secretary of Department of Corrections,
Respondents-Appellees.
 No. 81-5379.
 United States Court of Appeals,
Fifth Circuit.*
Unit B
 Dec. 23, 1982.
 
 Richard E. Shapiro, New Orleans, La., for petitioner-appellant.
 Calvin Fox, Asst. Atty. Gen., Miami, Fla., for respondents-appellees.
 Nicholas G. Dumich, Asst. Atty. Gen., Atlanta, Ga., for amicus curiae State of Ga.
 Ed Carnes, Asst. Alabama Atty. Gen., Montgomery, Ala., for amicus curiae State of Ala.
 Rene I. Salomon, Asst. Atty. Gen., Baton Rouge, La., for amicus curiae State of La.
 Appeals from the United States District Court for the Southern District of Florida.
 Before GODBOLD, Chief Judge, RONEY, TJOFLAT, HILL, FAY, VANCE, KRAVITCH, FRANK M. JOHNSON, Jr., HENDERSON, ANDERSON and THOMAS A. CLARK, Circuit Judges.**
 PER CURIAM:
 
 
 1
 There follows the opinion of Judge Vance concurred in by Chief Judge Godbold and Judges Kravitch and Henderson. Judge Tjoflat specially concurs by separate opinion in which Judge Clark concurs in part. By separate opinion Judge Johnson joined by Judge Anderson concurs in the substantive portions (Parts I, II-A, III-A, III-B and III-C) of Judge Vance's opinion, but dissents from Parts II-B and III-D, which relate to the disposition of this specific case on remand. As reflected in their respective opinions and concurrences a majority of the court, consisting of Chief Judge Godbold and Judges Tjoflat, Vance, Kravitch, Johnson, Henderson, Anderson and Clark, agree and it is therefore the judgment of the court that the district court's judgment be reversed and the case remanded.
 
 
 2
 On remand the further proceedings in the district court shall be controlled by Parts I, II-A, III-A, III-B and III-C of Judge Vance's opinion, all of which constitute the opinion of the court.
 
 
 3
 Judge Roney dissents in a separate opinion concurred in by Judges Hill and Fay. Judge Hill also filed a separate dissenting opinion.
 
 
 4
 REVERSED and REMANDED.
 
 VANCE, Circuit Judge:
 
 5
 In this opinion the en banc court addresses the proper standards for evaluating a claim of ineffective assistance of counsel based upon allegations of inadequate trial preparation. Petitioner-appellant David Leroy Washington appeals from the district court's denial of his petition for a writ of habeas corpus under 28 U.S.C. Sec. 2254. Washington has two primary contentions: (1) that his trial counsel did not render effective assistance because he failed to investigate, procure, and present character evidence relevant to the sentencing stage of his trial, and (2) that this failure prejudiced Washington in the conduct of his defense. We remand this case to the district court to determine whether trial counsel was ineffective under constitutional standards, and if so, whether Washington suffered actual and substantial prejudice.
 
 I. Factual and Procedural Background
 A. State Criminal Proceedings
 
 6
 During a ten-day period in September 1976 Washington committed a series of crimes which included three brutal murders. On September 20, 1976 Washington and an accomplice stabbed to death a minister, David Pridgen. Three days later Washington broke into the house of Mrs. Katrina Birk. After binding Mrs. Birk and her three elderly sisters-in-law, he shot and stabbed each of them, killing Mrs. Birk and inflicting severe injuries upon the others.[1] Finally, on September 29 Washington kidnapped Frank Meli, a twenty-year-old college student, and tied him to a bed with the help of two accomplices. After an attempt to extort ransom money from Meli's family failed, Washington stabbed him to death. Each of these criminal episodes involved a substantial degree of preparation and each included acts of theft.
 
 
 7
 On October 1, 1976 Washington surrendered to Dade County police after his two accomplices were arrested for the murder of Frank Meli. He voluntarily confessed to the crime in a lengthy statement to the police. On October 7 the state indicted Washington for the Meli murder and appointed William Tunkey, an experienced criminal lawyer,[2] to act as his attorney.
 
 
 8
 On November 5 Washington, acting against Tunkey's advice, confessed to the Pridgen and Birk murders. Additional indictments were returned, and Washington's trial was set for December 1 before Judge Richard Fuller.[3] Washington waived his right to a jury trial and, again acting against the advice of Tunkey, pleaded guilty to all charges when he went before Judge Fuller. During the plea colloquy Washington stated that he did not have a significant prior criminal record and explained to Judge Fuller that his actions were the result of extreme stress and anxiety due to his unemployment and his corresponding inability to provide for his family. Washington stated, however, that he accepted responsibility for his crimes. Judge Fuller responded that he had "a great deal of respect for people who are willing to step forward and admit their responsibility."
 
 
 9
 Washington also waived his right to have a sentencing jury. At the sentencing hearing on December 6 Tunkey adopted the testimony that Washington had given during the plea colloquy and argued that Washington's evident remorse and his willingness to face the consequences of his actions should persuade the court to impose life imprisonment rather than death. Tunkey also successfully moved to exclude Washington's "rap sheet" from evidence.
 
 
 10
 The judge specifically found, however, that even if Washington had no significant prior criminal record, the aggravating circumstances of the case would still "clearly far outweigh" the factors in mitigation. He therefore sentenced Washington to death on each of the three counts of first degree murder. He also sentenced Washington to consecutive terms of imprisonment for the other crimes. The death sentences were upheld on direct appeal. Washington v. State, 362 So.2d 658 (Fla.1978), cert. denied, 441 U.S. 937, 99 S.Ct. 2063, 60 L.Ed.2d 666 (1979).
 
 
 11
 B. Motion for Post-Conviction Relief in State Court
 
 
 12
 In March 1980 Washington, now represented by different counsel, moved for post-conviction relief in state circuit court. See Fla.R.Crim.P. 3.850. The primary focus of the motion was upon Tunkey's failure to investigate fully and develop character evidence that might have been presented to Judge Fuller as a matter in mitigation. In support of the motion, Washington attached fourteen affidavits from various friends, relatives, and acquaintances who stated that they would have testified on Washington's behalf if his attorney had requested them to do so. He also attached reports from two psychiatrists who stated that "while [Washington] was not under the influence of extreme mental or emotional disturbance, he was chronically frustrated and depressed because of his economic dilemma wherein he was unable to find employment and provide for his wife and children."
 
 
 13
 The Florida circuit court denied the motion without holding an evidentiary hearing.[4] It found that Washington had failed to satisfy the test for ineffective assistance of counsel established in Knight v. State, 394 So.2d 997 (Fla.1981), which requires a defendant to prove that his attorney's failure was a "substantial and serious deficiency measurably below that of competent counsel," and that the failure caused "prejudice to the defendant to the extent that there is a likelihood that the deficient conduct affected the outcome of the court proceedings." Id. at 1001 (citation omitted).[5] On appeal the Florida Supreme Court affirmed, finding that "the appellant has failed under the Knight criteria to make a prima facie showing of substantial deficiency or possible prejudice and has failed to such a degree that we believe, to the point of moral certainty, that he is entitled to no relief under rule 3.850."[6] Washington v. State, 397 So.2d 285, 287 (Fla.1981).
 
 
 14
 C. Federal Habeas Proceedings in District Court
 
 
 15
 Having exhausted his state remedies, Washington sought habeas corpus relief from the district court below.[7] Again, the petition attacked Tunkey's preparation for the sentencing phase of Washington's trial.
 
 
 16
 Petitioner called Tunkey as a witness at the evidentiary hearing. Tunkey testified that after Washington confessed to the Pridgen and Birk murders, he experienced a feeling of "hopelessness" regarding the case, and that he believed there was little chance of Washington avoiding the death penalty. His strategy at that point was to introduce evidence of Washington's emotional distress only during Washington's plea colloquy with Judge Fuller, and thereafter to rely primarily upon an "attempt to convince the judge of Washington's sincerity and frankness in pleading guilty."[8] Tunkey believed that this strategy might succeed in avoiding the death penalty because Judge Fuller had in other cases acknowledged his respect for people who unqualifiedly admitted their responsibility.
 
 
 17
 Tunkey also testified that he made little attempt to develop evidence of Washington's emotional distress apart from conversations with Washington in connection with his plea colloquy. Specifically, Tunkey did not follow up on initial telephone conversations with Washington's wife and mother after they had failed to keep appointments with him. Additionally, he did not request a presentence report or a psychiatric investigation because he anticipated that they might reveal information more harmful than helpful to his client.
 
 
 18
 The state called Judge Fuller as a witness. Over the strenuous objection of Washington's counsel, the judge testified that evidence of the type contained in petitioner's fourteen affidavits and two psychiatric reports would not have altered his determination that Washington deserved the death penalty.
 
 
 19
 The district court stated that the "central issue raised by the allegations is the assertion by petitioner that an adequate independent investigation by trial counsel would have revealed information and witnesses relevant to circumstances which may have mitigated the death sentence imposed."[9] Relying upon the decision of the former fifth circuit in Beavers v. Balkcom, 636 F.2d 114, 116 (5th Cir.1981), the court held that defense counsel in a capital case has a duty to investigate mitigating evidence irrespective of whether counsel's strategy at trial would require the use of such evidence. The court therefore found that Tunkey had made an "error in judgment" by failing to conduct such an investigation thoroughly. It stopped short, however, of finding that Tunkey was ineffective, stating that the Constitution does not require errorless counsel. Rather than deciding vel non whether Tunkey was ineffective, the court found that Washington was not prejudiced by Tunkey's error. In reaching that conclusion, the court held that Judge Fuller's testimony demonstrated that there was no "likelihood that counsel's inaction affected the outcome of the sentence" (citing United States v. Decoster, 624 F.2d 196, 208 (D.C.Cir.1979) (en banc)).[10]
 
 D. The Panel Opinion
 
 20
 Washington appealed the judgment below to this court. The majority panel opinion contained three major holdings: (1) the district court should determine on remand whether Washington's trial counsel was ineffective without regard to the prejudicial effect that may have resulted from counsel's errors; (2) the district court, if it finds trial counsel was ineffective, should grant relief if petitioner proves that "but for his counsel's ineffectiveness his trial, but not necessarily its outcome, would have been altered in a way helpful to him," and the state fails to prove that the error was harmless beyond a reasonable doubt; and (3) in assessing the prejudicial impact of the counsel's ineffectiveness, the district court should disregard Judge Fuller's testimony that the additional evidence would not have affected his verdict.
 
 
 21
 This court chose to reconsider the case en banc in order to determine important questions regarding the duty of trial counsel to investigate and the burden upon a habeas petitioner to demonstrate prejudice resulting from ineffectiveness of counsel. We determine that under some circumstances when a strategic choice by counsel makes unnecessary a certain line of investigation, it is not required that effective counsel pursue that investigation. We also determine that a habeas petitioner must show that his counsel's ineffectiveness caused "actual and substantial disadvantage" to the conduct of his defense. We remand this case to the district court for further proceedings consistent with this opinion.
 
 II. Ineffectiveness of Counsel
 
 22
 The sixth amendment guarantees to criminal defendants the right to assistance of counsel. Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). A vital corollary to this guarantee is the requirement of effective assistance of counsel, that is, counsel reasonably likely to render and rendering reasonably effective assistance given the totality of the circumstances. See, e.g., Herring v. Estelle, 491 F.2d 125, 127 (5th Cir.1974); MacKenna v. Ellis, 280 F.2d 592, 599 (5th Cir.1960), adhered to en banc, 289 F.2d 928 (5th Cir.), cert. denied, 368 U.S. 877, 82 S.Ct. 121, 7 L.Ed.2d 78 (1961). See also McMann v. Richardson, 397 U.S. 759, 771, 90 S.Ct. 1441, 1449, 25 L.Ed.2d 763 (1970). A petitioner who seeks to overturn his conviction on grounds of ineffective assistance of counsel must prove his entitlement to relief by a preponderance of the evidence.[11] United States v. Killian, 639 F.2d 206, 210 (5th Cir.), cert. denied, 451 U.S. 1021, 101 S.Ct. 3014, 69 L.Ed.2d 394 (1981); Mays v. Balkcom, 631 F.2d 48, 52 n. 1 (5th Cir.1980); Marino v. United States, 600 F.2d 462, 464 (5th Cir.1979).[12]
 
 A. The Duty to Investigate
 
 23
 Although the fate of a criminal defendant is determined at trial, the course of that trial can be decisively affected by actions of defense counsel in preparing the case. See, e.g., Moore v. United States, 432 F.2d 730, 739 (3d Cir.1970) (en banc). The courts have therefore insisted that effective counsel conduct a reasonable amount of pretrial investigation. See, e.g., Washington v. Watkins, 655 F.2d 1346, 1355-56 (5th Cir.1981), cert. denied, --- U.S. ----, 102 S.Ct. 2021, 72 L.Ed.2d 474 (1982); Davis v. Alabama, 596 F.2d 1214, 1217 (5th Cir.1979), vacated as moot, 446 U.S. 903, 100 S.Ct. 1827, 64 L.Ed.2d 256 (1980); Rummel v. Estelle, 590 F.2d 103, 104 (5th Cir.1979); Gaines v. Hopper, 575 F.2d 1147, 1149-50 (5th Cir.1978). Ultimately, the courts are concerned that counsels' decisions reflect "informed, professional deliberation" rather than "inexcusable ignorance or senseless disregard of their clients' rights." United States v. Bosch, 584 F.2d 1113, 1122 (1st Cir.1978).
 
 
 24
 The amount of pretrial investigation that is reasonable defies precise measurement. It will necessarily depend upon a variety of factors including the number of issues in the case, the relative complexity of those issues, the strength of the government's case, and the overall strategy of trial counsel. See, e.g., Washington v. Watkins, 655 F.2d at 1357; Wolfs v. Britton, 509 F.2d 304, 309 (8th Cir.1975). In making that determination, courts should not judge the reasonableness of counsel's efforts from the omniscient perspective of hindsight, but rather "from the perspective of counsel, taking into account all of the circumstances of the case, but only as those circumstances were known to him at the time in question." Washington v. Watkins, 655 F.2d at 1356.
 
 
 25
 The role of strategy in the calculus of reasonableness is of particular importance to this case. Tunkey testified that he made a strategic choice to introduce limited character evidence during the plea colloquy and thereafter to rely upon expressions of frankness, sincerity, and remorse to persuade the judge to impose a sentence of life imprisonment. In light of that strategy, Tunkey would have viewed as unnecessary an extensive investigation into Washington's character. The district court did not evaluate the credibility of Tunkey's testimony or the reasonableness of his strategy in light of available alternatives. Rather, the court concluded that Tunkey was obliged to conduct an extensive investigation of Washington's character irrespective of whether his trial strategy would benefit from such investigation, and cited Beavers v. Balkcom, 636 F.2d at 116, in support of that conclusion. In his dissent from the panel opinion, Judge Roney relied, inter alia, upon Plant v. Wyrick, 636 F.2d 188, 189-90 (8th Cir.1980), for an apparently contrary proposition:
 
 
 26
 When a strategic choice of action makes unnecessary a certain line of investigation, it should not be necessary for effective counsel to pursue that investigation.
 
 
 27
 Washington v. Strickland, 673 F.2d 879, 908 (5th Cir.1982) (Roney, J., dissenting).
 
 
 28
 The conflicting language in cases such as Beavers and Plant reflects the different factual situations in those cases. Upon close examination, however, the rules of law contained in those cases are broadly consistent. In cases such as Plant, the trial counsel substantially investigated one plausible line of defense which he presented at trial, but did not investigate another line which he had chosen not to pursue at trial.[13] In this class of cases, counsel made strategic choices of the general type that courts have traditionally respected in order to avoid undue interference with the adversary process. See, e.g., United States v. Decoster, 624 F.2d at 208. In cases such as Beavers, however, the trial counsel failed to conduct a substantial investigation into any plausible line of defense. In this class of cases counsel did not choose, strategically or otherwise, to pursue one line of defense over another. Instead, counsel simply abdicated his responsibility to advocate his client's cause. See, e.g., Gomez v. Beto, 462 F.2d 596, 597 (5th Cir.1972).
 
 
 29
 In our canvass of the case law, we have identified five major lines of cases involving the duty to conduct adequate investigation before proceeding to trial.[14] For the benefit of district courts that will confront future claims of ineffective assistance of counsel, we will discuss separately each line of cases and identify the proper role that counsel's strategy plays in the evaluation of the reasonableness of pretrial investigation.
 
 
 30
 1. Counsel fails to conduct substantial investigation into the one plausible line of defense in the case.
 
 
 31
 In numerous cases effective counsel would discern only one plausible line of defense to serve his client's interests. Whether that one line of defense is insanity, alibi, or simply putting the government to its proof, effective counsel is obliged to conduct a reasonably substantial investigation into that line before proceeding to trial. The failure to perform such an investigation is a clear example of a breach of the duty to investigate.
 
 
 32
 In Gomez v. Beto, 462 F.2d at 596, the defendant was prosecuted for a burglary that took place in Houston. The defendant contended that he was in San Antonio on the day of the crime and gave his attorneys the names of alibi witnesses. The attorneys failed to contact the witnesses and defendant was convicted. The court granted his motion for habeas corpus relief, stating:
 
 
 33
 These counsel knew that Gomez had only one possible defense to the charge: that he was in another city when the crime was committed.
 
 
 34
 ....
 
 
 35
 When a defense counsel fails to investigate his client's only possible defense, although requested by him to do so ... it can hardly be said that the defendant has had the effective assistance of counsel.
 
 Id. at 597.[15]
 
 36
 It is obvious that an attorney can no more make a strategic decision that renders unnecessary an investigation of a defendant's one plausible line of defense than he can make a strategic decision to plead guilty against his client's wishes. See, e.g., Wiley v. Sowders, 647 F.2d 642, 649 (6th Cir.), cert. denied, 454 U.S. 1091, 102 S.Ct. 656, 70 L.Ed.2d 630 (1981); Mullins v. Evans, 473 F.Supp. 1321, 1325 (D.Colo.1979), aff'd, 622 F.2d 504 (10th Cir.1980). Cf. Wright v. Estelle, 572 F.2d 1071, 1082 (5th Cir.) (en banc) (Godbold, J., dissenting) (strategic choice by counsel that deprives defendant of his constitutional right to testify, absent knowing waiver by defendant, is not effective assistance of counsel), cert. denied, 439 U.S. 1004, 99 S.Ct. 617, 58 L.Ed.2d 680 (1978). Therefore, permissible trial strategy can never include the failure to conduct a reasonably substantial investigation into a defendant's one plausible line of defense. See Ewing v. Williams, 596 F.2d 391, 398-99 (9th Cir.1979) (Ely, J., dissenting) ("a complete lack of preparation and investigation [cannot] be deemed to be a 'tactical decision' made by the attorney"); Wood v. Zahradnick, 430 F.Supp. 107, 112 (E.D.Va.1977) (where defenses based upon mental condition were the only plausible line of defense, "the [c]ourt can envision no tactical reason why these defenses were not explored"), aff'd in relevant part, 578 F.2d 980 (4th Cir.1978).
 
 
 37
 2. Counsel conducts a reasonably substantial investigation into the one line of defense that is presented at trial.
 
 
 38
 In this class of decisions we again deal with cases in which effective counsel would discern only one plausible line of defense or in which he chooses to rely upon only one major line of defense. An attorney who conducts a reasonably substantial investigation into that line of defense before it is presented at trial is often criticized by his client after the defense proves unsuccessful for not having conducted a more extensive investigation. Courts have emphasized that "counsel for a criminal defendant is not required to pursue every path until it bears fruit or until all conceivable hope withers." Lovett v. Florida, 627 F.2d 706, 708 (5th Cir.1980). See also Baty v. Balkcom, 661 F.2d 391, 395 n. 8 (5th Cir.1981); Williams v. Maggio, 679 F.2d 381, 393 (5th Cir.1982) (Unit A en banc); Cox v. Wyrick, 642 F.2d 222, 226-27 (8th Cir.), cert. denied, 451 U.S. 1021, 101 S.Ct. 3013, 69 L.Ed.2d 394 (1981); United States v. Decoster, 624 F.2d at 210-11. Rather, attorneys must conduct a substantial investigation which includes "an independent examination of the facts, circumstances, pleadings and laws involved." Rummel v. Estelle, 590 F.2d at 104; United States v. Moore, 554 F.2d 1086, 1092-93 (D.C.Cir.1976).
 
 
 39
 The question whether counsel conducted a reasonable amount of investigation prior to presenting the one line of defense at trial does not typically involve strategic choices. Once the choice has been made to rely upon one defense at trial, counsel is of course obliged to make a reasonable, though not necessarily exhaustive, investigation before trial.[16]
 
 
 40
 3. Counsel conducts a reasonably substantial investigation into all plausible lines of defense and chooses to rely upon fewer than all of them at trial.
 
 
 41
 In this class of cases effective counsel would discern more than one plausible line of defense to serve his client's interests. Certain of the lines might be presented at trial in tandem. For instance, an attorney might challenge the racial composition of the grand jury venire and raise an alibi defense where both appear to be plausible. Other lines of defense may be contradictory and thus incapable of being presented persuasively in tandem. For instance, an attorney might not present an alibi defense in conjunction with a justifiable homicide defense.[17]
 
 
 42
 Before making a strategic choice as to which lines of defense to employ at trial, counsel should ideally conduct a substantial investigation into each potential line. In this way he would be able to assess with a considerable degree of professional accuracy which lines are most likely to succeed at trial. He would be able to discuss thoroughly the options with his client. For these reasons, the American Bar Association has suggested that criminal defense counsel "conduct appropriate investigations, both factual and legal, to determine what matters of defense can be developed." American Bar Association, Project on Standards for Criminal Justice, Standards Relating to the Defense Function (App.Draft 1971) [hereinafter referred to as American Bar Association Standards]; see Coles v. Peyton, 389 F.2d 224, 226 (4th Cir.) (applying identical standard), cert. denied, 393 U.S. 849, 89 S.Ct. 80, 21 L.Ed.2d 120 (1968).
 
 
 43
 When an attorney makes a strategic choice after satisfying this rigorous and extensive duty to investigate, courts will seldom if ever find that the choice was the result of ineffective assistance of counsel. Our adversary system of justice requires that attorneys be permitted to exercise informed discretion in the conduct of the client's defense. United States v. Decoster, 624 F.2d at 208. See also United States v. Guerra, 628 F.2d 410, 413 (5th Cir.1980), cert. denied, 450 U.S. 934, 101 S.Ct. 1398, 67 L.Ed.2d 369 (1981); Marino v. United States, 600 F.2d at 463; Williams v. Maggio, 679 F.2d at 393.[18] If an attorney makes a strategic choice to rely upon one line of defense rather than another, and that choice is based upon the exercise of professional judgment after a reasonably substantial investigation into all plausible lines of defense, the courts will find ineffective assistance of counsel only if the choice was so patently unreasonable that no competent attorney would have made it. Cf. United States ex rel. Robinson v. Pate, 312 F.2d 161, 162 (7th Cir.1963) (counsel not ineffective because strategic choice was one about which competent attorneys might honestly disagree).
 
 
 44
 4. Counsel fails to conduct a substantial investigation into one plausible line of defense because of his reasonable strategic choice to rely upon another plausible line of defense at trial.
 
 
 45
 As observed above, when effective counsel would discern several plausible lines of defense he should ideally perform a substantial investigation into each line before making a strategic decision as to which lines he will employ at trial. This ideal, as expressed in the American Bar Association Standards, is an aspiration to which all defense counsel should strive. It does not, however, represent the constitutional minimum for reasonably effective assistance of counsel. See United States v. Decoster, 624 F.2d at 205, 210-11. See also Cooper v. Fitzharris, 586 F.2d 1325, 1330 (9th Cir.1978) (en banc), cert. denied, 440 U.S. 974, 99 S.Ct. 1542, 59 L.Ed.2d 793 (1979); United States v. Moore, 554 F.2d at 1093 (Robb, J., concurring) (both opinions criticize checklist approach to evaluating performance of counsel). Realistically, given the finite resources of time and money that are available to defense counsel, fewer than all plausible lines of defense will be the subject of substantial investigation. Often, counsel will make a choice of trial strategy relatively early in the representation process after conferring with his client, reviewing the state's evidence, and bringing to bear his experience and professional judgment.[19] Thereafter he will concentrate his finite resources on investigating those lines of defense upon which he has chosen to rely.
 
 
 46
 The choice by counsel to rely upon certain lines of defense to the exclusion of others before investigating all such lines is a strategic choice. See, e.g., Gray v. Lucas, 677 F.2d 1086, 1093 (5th Cir.1982). The basis for judicial deference to such a choice, however, is eroded measurably. See Note, Effective Assistance of Counsel for the Indigent Defendant, 78 Harv.L.Rev. 1434, 1439 (1965). Whereas a strategy chosen after full investigation is entitled to almost automatic approval by the courts, a strategy chosen after partial investigation must be scrutinized more closely in order to safeguard the rights of criminal defendants.
 
 
 47
 A strategy chosen without the benefit of a reasonably substantial investigation into all plausible lines of defense is generally based upon counsel's professional assumptions regarding the prospects for success offered by the various lines. The cases generally conform to a workable and sensible rule: when counsel's assumptions are reasonable given the totality of the circumstances and when counsel's strategy represents a reasonable choice based upon those assumptions, counsel need not investigate lines of defense that he has chosen not to employ at trial.[20]
 
 
 48
 In Washington v. Watkins the attorney for a defendant charged with capital murder relied primarily upon an alibi defense. When that defense proved unsuccessful and defendant was sentenced to death, the defendant sought habeas corpus relief because, inter alia, his attorney failed "to investigate the apparent under-representation of blacks on the relevant jury panels ...." 655 F.2d at 1364. At the evidentiary hearing in district court, the attorney was asked why he failed to conduct this investigation. He responded that based upon his prior experience with juries in Columbus, Mississippi and based upon his observation of the tactics of other attorneys, he assumed that a challenge based upon the racial composition of the jury panels would be "without merit." Id. at n. 36. The court found that in light of these circumstances, counsel's strategic decision to devote his efforts to the alibi defense "was not so ill-chosen that it made [his] overall representation constitutionally ineffective." 655 F.2d at 1364. In numerous other cases, courts have similarly found that a reasonable strategic choice based upon reasonable assumptions makes it unnecessary to investigate other plausible lines of defense that counsel does not rely upon at trial.[21]
 
 
 49
 On the other hand, courts have not hesitated to find counsel ineffective when his failure to investigate is not based upon a reasonable set of assumptions or when the strategic choices made by counsel on the basis of those assumptions are not reasonable. The California case of In re Saunders, 2 Cal.3d 1033, 88 Cal.Rptr. 633, 472 P.2d 921 (1970), furnishes an excellent illustration. In Saunders the defendant participated in an armed robbery which resulted in the murder of a store clerk. He was tried for capital murder and counsel was appointed to defend him. Two months before trial the defendant and his mother informed counsel that the defendant had previously suffered head injuries that resulted in organic brain damage. Although the attorney was aware that this information was relevant to the diminished capacity defense under California law, he never investigated the matter. Instead, he relied exclusively upon an argument that defendant did not actually commit the shooting.
 
 
 50
 The attorney later testified that he failed to investigate the diminished capacity line of defense before trial because he had made a strategic choice to preserve that argument for the clemency hearing. The California Supreme Court overturned the conviction. It found that a reasonable attorney would have recognized that diminished capacity was a very promising line of investigation in light of the information furnished to counsel by defendant and his mother. It also found that a reasonable attorney would not have made the strategic choice to rely upon the weak defense used to the exclusion of the diminished capacity defense.[22]
 
 
 51
 In sum, an attorney who makes a strategic choice to channel his investigation into fewer than all plausible lines of defense is effective so long as the assumptions upon which he bases his strategy are reasonable and his choices on the basis of those assumptions are reasonable.[23]
 
 
 52
 5. Counsel fails to conduct a substantial investigation into plausible lines of defense for reasons other than strategic choice.
 
 
 53
 When an attorney fails to conduct a substantial investigation into any of his client's plausible lines of defense, the attorney has failed to render effective assistance of counsel. The attorney equally fails to render effective assistance when he chooses among several plausible lines of defense, thereby excluding certain of them, for no strategic reason.
 
 
 54
 The clearest example of this breach of the duty to investigate appears in Gaines v. Hopper, 575 F.2d at 1147. In that case the attorney's policy against interviewing any witnesses before trial left him "in no better position than his jailed client to evaluate the legal and factual realities of the case ...." Id. at 1149. The attorney did not channel his investigation on the basis of a professional assessment of the prospects for success. Rather, he abandoned his obligation to develop a case for his client. See also Powell v. Alabama, 287 U.S. 45, 58, 53 S.Ct. 55, 60, 77 L.Ed. 158 (1932); United States v. Hinton, 631 F.2d 769, 780 (D.C.Cir.1980); United States v. Porterfield, 624 F.2d 122, 125 (10th Cir.1980); United States v. Bosch, 584 F.2d at 1122.[24]
 
 
 55
 In many cases it will not be clear whether the failure to investigate a line of defense is based upon trial strategy or upon neglect of counsel's professional obligations. Courts presume, in accordance with the general presumption of attorney competence, that counsel's actions are strategic. See, e.g., Michel v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 164, 100 L.Ed. 83 (1955); Marino v. United States, 600 F.2d at 463; Tuttle v. Decker, 386 F.2d 814, 816 n. 1 (5th Cir.1967); Cowens v. Wainwright, 373 F.2d 34, 34 (5th Cir.), cert. denied, 387 U.S. 913, 87 S.Ct. 1701, 18 L.Ed.2d 635 (1967); United States v. Aulet, 618 F.2d 182, 189 (2d Cir.1980). Cf. The Supreme Court, 1976 Term, 91 Harv.L.Rev. 70, 219 (1977) (noting the presumption of strategic choice in sixth amendment cases and suggesting another rule in cases involving the determination of "deliberate bypass"). This presumption can be rebutted, however, when trial counsel testifies credibly at an evidentiary hearing that his choice was not strategic, see, e.g., Beckham v. Wainwright, 639 F.2d 262, 265-66 (5th Cir.1981); Marzullo v. Maryland, 561 F.2d 540, 547 (4th Cir.1977), cert. denied, 435 U.S. 1011, 98 S.Ct. 1885, 56 L.Ed.2d 394 (1978), or when certain of counsel's actions do not conform to a general pattern of a rational trial strategy. See, e.g., Baty v. Balkcom, 661 F.2d at 395; Nero v. Blackburn, 597 F.2d 991, 994 (5th Cir.1979); United States v. Bosch, 584 F.2d at 1121-22.
 
 B. The Need for a Remand
 
 56
 In this case the district court stated that Tunkey was obligated to investigate substantially a line of defense based upon emotional distress irrespective of whether Tunkey's trial strategy made that investigation necessary. The district court's legal premise was incomplete. If, in fact, there was more than one plausible line of defense in the case; if Tunkey made a strategic choice based upon reasonable assumptions to pursue one line of defense at the expense of another; and if that strategic choice was reasonable, Tunkey did not breach his duty to investigate.
 
 
 57
 When district courts fail to make findings or do so on the basis of an erroneous perception of the law, courts of appeals ordinarily remand the case "unless the record permits only one resolution of the factual issue." Pullman-Standard v. Swint, 456 U.S. ----, ----, 102 S.Ct. 1781, 1791-92, 72 L.Ed.2d 66 (1982). In this case numerous factual issues remain to be resolved by the district court before it can be determined with certainty whether counsel was reasonably effective. We therefore remand this case for it to make findings on these factual issues.
 
 III. The Showing of Prejudice
 
 58
 If the district court finds on remand that Washington's right to effective assistance of counsel was violated, it should then separately determine whether Washington suffered prejudice of sufficient magnitude to warrant granting the writ of habeas corpus. We decide that the petitioner has the burden of persuasion to demonstrate that the ineffective assistance created not only "a possibility of prejudice, but that [it] worked to his actual and substantial disadvantage." See United States v. Frady, 456 U.S. 152, 170, 102 S.Ct. 1584, 1596, 71 L.Ed.2d 816 (1982) (emphasis in original).[25] If he successfully satisfies this burden, the writ must be granted unless the state proves that counsel's ineffectiveness was harmless beyond a reasonable doubt. See Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). We proceed to examine the basis for this holding.
 
 A. The Need for a Prejudice Requirement
 
 59
 We are confronted at the outset with Washington's contention that the courts should find ineffective assistance of counsel prejudicial per se. Under petitioner's proposed rule, the writ would issue automatically upon petitioner's showing of ineffective assistance. In support of this rule, Washington cites numerous cases including Gideon v. Wainwright, 372 U.S. at 335, 83 S.Ct. 729, Geders v. United States, 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976), and Cuyler v. Sullivan, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). We find that these cases are instantly distinguishable.
 
 
 60
 In Gideon v. Wainwright the state refused to appoint counsel to assist in the defense of an indigent defendant. This absolute deprivation of the right to counsel is so inherently prejudicial that the courts will not conduct a particularized inquiry into whether harm was realized in a particular case. See Chapman v. California, 386 U.S. at 43, 87 S.Ct. at 837 (Stewart, J., concurring).
 
 
 61
 In Geders the trial court ordered a defendant not to consult with his attorney during an overnight recess after his direct examination and before his cross-examination. While the defendant did not suffer a total deprivation of the right to counsel, the trial court's action constituted direct state interference with important aspects of the attorney's representation of his client. See also Herring v. New York, 422 U.S. 853, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975); Brooks v. Tennessee, 406 U.S. 605, 92 S.Ct. 1891, 32 L.Ed.2d 358 (1972); Ferguson v. Georgia, 365 U.S. 570, 81 S.Ct. 756, 5 L.Ed.2d 783 (1961); Powell v. Alabama, 287 U.S. at 45, 53 S.Ct. 55. Although such limited interference is not inherently prejudicial, a rule of automatic reversal serves to deter the state from engaging in action that poses a direct threat to the defendant's right to effective assistance of counsel. See United States v. Decoster, 624 F.2d at 201.
 
 
 62
 Finally, in cases such as Cuyler the defendant was represented by an attorney who functioned under an actual conflict of interest. This impediment to effective representation was neither inherently prejudicial nor the product of direct state interference in the representation process. The Supreme Court granted automatic reversal, however, because the subtle and pervasive effect of conflicting loyalties upon an attorney would necessarily make any inquiry into prejudice an exercise in "unguided speculation." Holloway v. Arkansas, 435 U.S. 475, 491, 98 S.Ct. 1173, 1182, 55 L.Ed.2d 426 (1978); see Glasser v. United States, 315 U.S. 60, 75-76, 62 S.Ct. 457, 467, 86 L.Ed. 680 (1942).
 
 
 63
 In this case Washington did not suffer the inherent prejudice that attended the total deprivation of counsel in Gideon. Nor does he complain of state interference in the attorney-client relationship as was evident in Geders. Rather, he contends that the attorney provided to him by the state, a competent and experienced criminal lawyer, rendered assistance that was below the standard of reasonably effective counsel. Unlike the defendant in Cuyler, Washington does not contend that this ineffectiveness resulted from any subtle or pervasive impediment to Tunkey's performance. Rather, he contends that Tunkey committed several discrete errors of omission and commission that reasonably effective counsel would not have committed. The process of identifying and the evaluating the effect of these individual errors is not an exercise in "unguided speculation." Rather, the inquiry into whether these errors resulted in harm is a task that the district courts are well suited to perform. See Davis v. Alabama, 596 F.2d at 1222-23; United States v. Decoster, 624 F.2d at 201-03 (plurality opinion), 257-58 (Robinson, J., concurring); Cooper v. Fitzharris, 586 F.2d at 1332; United States ex rel. Green v. Rundle, 434 F.2d 1112, 1115 (3d Cir.1970). See also Chambers v. Maroney, 399 U.S. 42, 54, 90 S.Ct. 1975, 1982, 26 L.Ed.2d 419 (1970) (relief for ineffective assistance of counsel denied where "the claim of prejudice was without substantial basis").[26] Accordingly, we conclude that no Supreme Court decision requires a finding of per se prejudice in this type of case. We also perceive several strong considerations that militate against creating such a rule.
 
 
 64
 First, a rule of per se prejudice would be contrary to the teachings of United States v. Morrison, 449 U.S. 361, 364-65, 101 S.Ct. 665, 668, 66 L.Ed.2d 564 (1981), that the remedy for a violation of defendant's right to adequate assistance of counsel should be tailored to the harm caused by that violation. The defendant in Morrison demonstrated "no prejudice of any kind" and the Court found:
 
 
 65
 There is no effect of a constitutional dimension which needs to be purged to make certain that respondent has been effectively represented and not unfairly convicted. The Sixth Amendment violation, if any, accordingly provides no justification for interfering with the criminal proceedings against [defendant].
 
 
 66
 Id. at 366-67, 101 S.Ct. at 669. Washington's proposed rule of per se prejudice would require the unwarranted interference in criminal proceedings that Morrison expressly forbids.[27]
 
 
 67
 Additionally, a rule of per se prejudice is especially inappropriate in the case of ineffective assistance because the state is not responsible for the violation of the petitioner's rights. Since the rule would not serve to deter the state from any unconstitutional course of action, the sole effect of the rule would be to bestow an undeserved windfall upon criminal defendants who were not harmed by the errors of their attorneys. See Note, supra, at 1436-37.[28]
 
 
 68
 Finally, the proposed rule would distort the function of the writ of habeas corpus under 28 U.S.C. Sec. 2254. The writ exists to redress fundamental unfairness in state criminal proceedings. Rose v. Lundy, 455 U.S. 509, 543, 102 S.Ct. 1198, 1216, 71 L.Ed.2d 379 (1982) (Stevens, J., dissenting). See also Lehman v. Lycoming County Children's Services Agency, 458 U.S. ----, ----, 102 S.Ct. 3231, 3239-40, 73 L.Ed.2d 928 (1982). A particularized inquiry must be made in cases of ineffective assistance of counsel to determine whether the fundamental unfairness that the writ was intended to redress exists in an individual case. See Nelson v. Estelle, 642 F.2d 903, 906 (5th Cir.1981); United States v. Decoster, 624 F.2d at 207.
 
 B. Allocation of the Burden of Proof
 1. The Chapman Standard
 
 69
 Having determined that there must be a showing of prejudice, it remains for us to allocate the burden of proof on this issue. For many constitutional violations the existence of prejudice is presumed, and the state can rebut it only upon a showing of harmlessness beyond a reasonable doubt. See Chapman v. California, 386 U.S. at 24, 87 S.Ct. at 828.[29] In certain respects, however, the violation of a defendant's right to effective assistance of counsel is sui generis. See, e.g., McQueen v. Swenson, 498 F.2d 207, 218 (8th Cir.1974). The violation is not caused by the state. Consequently, the harsh burden of proof in Chapman, which is meant to prevent the state from benefiting from its own wrongs, does not serve the same equitable and deterrent function in cases of ineffective assistance of counsel. Id. at 219. Additionally, where ineffectiveness is predicated upon the failure of counsel to raise certain objections, application of the Chapman rule would relieve petitioner of the requirement that he show prejudice before he can raise those objections on collateral review. Cooper v. Fitzharris, 586 F.2d at 1333. See generally United States v. Frady, 456 U.S. at 170, 102 S.Ct. at 1596.[30] Alternatively, when counsel is faulted for his failure to develop and present a certain line of evidence, application of the Chapman rule would require the state to prove that the failure to produce certain evidence was harmless beyond a reasonable doubt, even though the evidence is more readily accessible to the petitioner. See United States v. Valenzuela-Bernal, 458 U.S. ----, ----, 102 S.Ct. 3440, 3448-49, 73 L.Ed.2d 1193 (1982); United States v. Decoster, 624 F.2d at 228 (MacKinnon, J., concurring); Coles v. Peyton, 389 F.2d at 230 (Craven, J., dissenting).[31]
 
 
 70
 For these reasons, we believe that application of the Chapman standard without an initial showing of harm by the petitioner would be ill-advised.
 
 2. The Decoster Standard
 
 71
 In Wright v. Estelle, Chief Judge Godbold stated:
 
 
 72
 In this circuit, we have consistently held that one suffering inadequate counsel need not show to receive a new trial that adequate counsel would change the result on retrial.
 
 
 73
 572 F.2d at 1084 (Godbold, J., dissenting). The plurality opinion in United States v. Decoster, however, requires the petitioner to prove precisely that. 624 F.2d at 208, 211-12; see supra note 5. We reject the outcome-determinative test in Decoster for reasons analogous to those that lead us to reject the Chapman standard. First, in cases where the allegation of ineffective assistance is based upon counsel's failure to raise certain objections, the Decoster test requires the petitioner to carry a burden of showing prejudice that is different from and greater than the analogous burden in the "cause and prejudice" formulation of Wainwright v. Sykes, 433 U.S. 72, 87, 97 S.Ct. 2497, 2506, 53 L.Ed.2d 594 (1977). Application of the Decoster rule may thus have the surprising result of holding a petitioner who has established a deprivation of his constitutional right to effective assistance of counsel to a greater showing of prejudice than if he was merely trying to present a claim of constitutional error not raised in the state courts.[32]
 
 
 74
 Additionally, when counsel is faulted for failing to develop a certain line of evidence, Decoster would require the petitioner to demonstrate, first, what evidence would have been produced and, second, that in the context of the entire case the additional evidence would have altered the result. While the first showing is properly allocated to the petitioner because he is better situated to show what evidence could be uncovered in his favor, he is no better situated than the state to demonstrate that the new evidence was likely to alter the outcome of the case. We believe that where the petitioner has shouldered the considerable burden of showing a violation of his sixth amendment rights that resulted in actual and substantial disadvantage to his case, it is inequitable to encumber him with the further responsibility of showing that the disadvantage determined the outcome of the entire case. See McQueen v. Swenson, 498 F.2d at 220.
 
 3. The Panel Majority
 
 75
 The panel majority attempted to steer between the Scylla and Charybdis of Chapman and Decoster by imposing upon the petitioner the burden of showing that "but for his counsel's ineffectiveness his trial, but not necessarily its outcome, would have been altered in a way helpful to him." Washington v. Strickland, 673 F.2d at 902. We are now convinced that this standard does not represent a significant improvement upon the Chapman standard. A decision of the Supreme Court handed down shortly after the publication of the panel opinion discussed the practical effect of a prejudice standard similar to the panel majority's standard. In United States v. Valenzuela-Bernal the defendant claimed that the government violated his rights under the compulsory process clause of the sixth amendment by deporting individuals who would have offered testimony in his defense. The court of appeals overturned his conviction after the defendant made a showing that the witnesses' expected testimony was of "conceivable benefit" to the defendant. The Supreme Court characterized this test as a virtual per se rule:
 
 
 76
 Given the vagaries of a typical jury trial, it would be a bold statement indeed to say that the testimony of any missing witness could not have "conceivably benefited" the defense. To us, the number of situations which will satisfy this test is limited only by the imaginations of judges or defense counsel.
 
 
 77
 458 U.S. at ----, 102 S.Ct. at 3446 (footnote omitted).
 
 
 78
 We believe it is equally true given the "vagaries of a typical jury trial" that virtually any new piece of favorable evidence produced by a petitioner at a habeas hearing may be "helpful to him." We therefore reject the test of the panel majority.
 
 4. Actual and Substantial Detriment
 
 79
 The test for prejudice in Frady suggests the proper allocation of the burden of proof on the issue of prejudice. In order to sustain that burden, the petitioner must show that ineffectiveness of counsel resulted in actual and substantial disadvantage to the course of his defense. This burden is of sufficient magnitude to discourage the filing of insubstantial claims and to focus the attention of the district court on the actual harm suffered by the petitioner as a result of his counsel's performance. At the same time, the burden does not require the petitioner to produce evidence to which he is unlikely to have access. It also properly reserves for the state the ultimate burden of showing that any constitutional error that did occur was harmless beyond a reasonable doubt. Thus, even if the defense suffered actual and substantial disadvantage, the state may show in the context of all the evidence that it remains certain beyond a reasonable doubt that the outcome of the proceedings would not have been altered but for the ineffectiveness of counsel. See generally Chapman v. California, 386 U.S. at 24, 87 S.Ct. at 828.
 
 C. Testimony of Judge Fuller
 
 80
 In reaching its decision that Washington did not suffer prejudice, the district court considered testimony from Judge Fuller, the state trial judge who imposed the death penalty. The district court could properly consider that testimony to the extent that it contains personal knowledge of historical facts or expert opinion. See 10 J. Moore & H. Bendix, Moore's Federal Practice Sec. 605.02 (1982). We decide, however, that the portion of Judge Fuller's testimony in which he explained his reasons for imposing the death sentence and his probable response to the evidence adduced at the habeas hearing is inadmissible evidence that may not be considered by the district court.
 
 
 81
 It is a firmly established rule in our jurisprudence that a judge may not be asked to testify about his mental processes in reaching a judicial decision. In Fayerweather v. Ritch, 195 U.S. 276, 25 S.Ct. 58, 49 L.Ed. 193 (1904), the Supreme Court held:
 
 
 82
 [T]he testimony of the trial judge, given six years after the case had been disposed of, in respect to matters he considered and passed upon, was obviously incompetent. True, the reasoning of the court for the rule [prohibiting testimony by jurors] is not wholly applicable, for as the case was tried before a single judge there were not two or more minds coming by different processes to the same result. Nevertheless no testimony should be received except of open and tangible facts--matters which are susceptible of evidence on both sides. A judgment is a solemn record. Parties have a right to rely upon it. It should not lightly be disturbed, and ought never to be overthrown or limited by the oral testimony of a judge or juror of what he had in mind at the time of the decision.
 
 
 83
 Id. at 306-07, 25 S.Ct. at 67-68. See also United States v. Crouch, 566 F.2d 1311, 1316 (5th Cir.1975).
 
 
 84
 There are several strong policy reasons that counsel continued adherence to this rule. First, such testimony poses special risks of inaccuracy. The testimony is often given several years after the fact and a judge is unlikely to be able to reconstruct his thought processes accurately over such a span of time. Second, the finality and integrity of judgments would be threatened by a rule that enabled parties to attack a judgment by probing the mental processes of a judge. Similar considerations underlie the rule against probing the mental processes of jurors. See United States v. D'Angelo, 598 F.2d 1002, 1004-05 (5th Cir.1979); Fed.R.Evid. 606(b).
 
 
 85
 Finally, a rule that allows the probing of the mental processes of a state judge would exacerbate certain problems that are already inherent in the habeas corpus context. The tendency of the habeas proceeding to detract from "the perception of the trial of a criminal case in state court as a decisive and portentous event," Wainwright v. Sykes, 433 U.S. at 90, 97 S.Ct. at 2508, is enhanced by the prospect that the state trial judge may be called into federal court several years later to recreate his thought processes at the criminal trial. Additionally, the friction between the state and federal systems of justice can hardly be alleviated by a rule that permits the parties to interrogate a state judge in federal court regarding the basis for his decision. See, e.g., Rose v. Lundy, 455 U.S. at 518, 102 S.Ct. at 1203; Sumner v. Mata, 449 U.S. 539, 550 & n. 3, 101 S.Ct. 764, 771 & n. 3, 66 L.Ed.2d 722 (1981).
 
 D. The Need for a Remand
 
 86
 The district court purported to apply the test in Decoster to determine that the petitioner failed to sustain his burden of showing prejudice. It also considered testimony from Judge Fuller regarding his mental processes in reaching his verdict. Since we reject the Decoster rule and find that one portion of Judge Fuller's testimony was inadmissible, it is necessary to remand the case to the district court for further findings. See Pullman-Standard v. Swint, 456 U.S. at ----, 102 S.Ct. at 1791-92.
 
 IV. Conclusion
 
 87
 On remand, the district court should initially determine whether Washington's right to effective assistance of counsel was violated. If the district court finds a violation, it should then determine whether the petitioner suffered actual and substantial detriment to the conduct of his defense.[33] Finally, if the petitioner meets this twin burden, the district court must determine whether, in the context of the entire case, the detriment suffered was harmless beyond a reasonable doubt.[34] The district court may, in its discretion, conduct further proceedings.
 
 TJOFLAT, Circuit Judge, specially concurring:
 
 88
 This case comes before this en banc court as an appeal from the district court's decision to deny petitioner a writ of habeas corpus. A divided panel of this court voted to vacate in part the district court's decision and to remand the case. I agree with the panel that this case must be remanded, but do so for different reasons.
 
 
 89
 Petitioner's main contention in support of his application for a writ, and the only contention with which this en banc court is concerned, is that he was denied his federal constitutional right, under the sixth, and fourteenth, amendments, to the effective assistance of counsel. In support thereof, petitioner alleges that his counsel incompetently failed to produce certain mitigating evidence at his state capital-sentencing trial. Petitioner also alleges, as he must to support his claim, that he was prejudiced by his counsel's incompetent omission.
 
 
 90
 To prevail on his claim, petitioner must sustain both aspects of it: incompetence and prejudice arising therefrom. It is only the latter aspect of this claim with which this opinion is concerned. Because I believe petitioner cannot prevail on the prejudice aspect of his claim, I do not reach the issue whether counsel was incompetent.
 
 
 91
 My discussion proceeds as follows. First, I discuss the facts and the procedural history of this case. Second, I announce the proper standard for determining prejudice arising from counsel's allegedly incompetent failure to produce mitigating evidence at a state capital-sentencing trial. Third, I discuss the way in which the standard I propose must be applied. And fourth, I describe the errors the district court committed in this case.
 
 
 92
 Before beginning my discussion, I note the central themes running throughout this opinion. The first theme is the most basic and all the others follow from it--that prejudice must be determined as a matter of state law.[1] Although the ultimate question of ineffectiveness must be decided based on federal constitutional standards, the threshold, and in this case dispositive, question of prejudice is a state law question. The second theme follows directly from the first--federal courts should not interfere in this state law area unless it is absolutely necessary to resolve the claim of ineffectiveness. For this reason, I propose a test for prejudice that minimizes federal court intrusion on state law. The third, and final, theme is that federal courts need not even engage in sensitive determinations of prejudice if state collateral attack courts clearly articulate the state law, in this case state sentencing policy, and if federal courts are aware of their duty to dismiss unexhausted habeas claims. I now begin my discussion.
 
 I.
 
 93
 On September 20, 1976, the petitioner and an accomplice robbed and murdered Daniel Pridgen, a minister; petitioner stated that they killed Pridgen because he believed that a minister who engaged in homosexual activities, as he alleges Pridgen did, is a "hypocrite." On September 23, petitioner broke into the house of Katrina Birk with an intent to rob. Finding Ms. Birk and her three elderly sisters-in-law, and experiencing difficulty during the course of the robbery, petitioner shot and stabbed each victim, killing Ms. Birk and gravely injuring the others. On September 26, petitioner and two accomplices kidnapped Frank Meli. Petitioner killed Meli on September 29 when a ransom demand failed.[2]
 
 
 94
 A. The State Proceedings.
 
 
 95
 On October 1, 1976, petitioner surrendered to police after the apprehension of his accomplices in the Meli case. He confessed and was indicted in the Dade County Circuit Court for that murder and related, lesser offenses on October 7. William Tunkey, the counsel whose effectiveness at the sentencing phase of petitioner's trial is in question here, was appointed at that time.[3]
 
 
 96
 Acting against the advice of counsel, petitioner confessed to the other crimes described above on November 5, 1976, and was indicted for them on November 17. Again acting against the advice of counsel, petitioner pled guilty to all charges in all three cases on December 1, 1976. The circuit judge conducted a thorough and extensive colloquy to ensure the voluntariness of the guilty plea and then accepted it. Petitioner then waived his right to a jury at the sentencing hearing.
 
 
 97
 At the sentencing hearing, the state opened by detailing the circumstances of the three murders. Tunkey waived an opening statement, relying on a sentencing memorandum filed with the court. The state then called nine witnesses who testified about the aggravated nature of the offenses. It also introduced fifteen exhibits that portrayed the aggravated nature of the crimes.
 
 
 98
 Tunkey did not introduce any new evidence in mitigation; instead, he adopted petitioner's prior statement at the guilty plea colloquy, thus shielding his client from cross-examination. This previous statement dealt primarily with matters germane to the guilty plea; it also contained some very limited information petitioner volunteered about his dire economic situation, his remorse, and his emotional state. The circuit judge foreclosed the petitioner's attempt to make a more detailed explanation of his actions at the plea hearing, and stated that the court would consider such information at sentencing. Tunkey, however, declined this explicit invitation to introduce evidence in mitigation at the sentencing hearing.
 
 
 99
 The state then made a closing argument. Tunkey followed, briefly emphasizing the defendant's honesty in admitting his guilt, stressing the existence of the possibility of life imprisonment without option for parole, and asking the court for mercy. The state then made a brief rebuttal argument.
 
 
 100
 The court imposed three sentences of death for the three murders.[4] In imposing these sentences, the court followed the procedures the Florida death penalty statute, Fla.Stat. Sec. 921.141, mandated. First, it arrived at petitioner's sentencing profile. It did this by finding and then weighing statutory aggravating circumstances, id. Sec. 921.141(5), and statutory, id. Sec. 921.141(6), and nonstatutory mitigating circumstances. It then combined these circumstances to arrive at a comprehensive profile of the defendant and his crime.[5] Second, the court discerned the state's sentencing policy applicable to petitioner's case. This policy was expressed in sentencing decisions in cases presenting profiles similar to petitioner's. Third, the court applied such policy to petitioner's profile and determined that death was the appropriate sentence in all three cases. The Florida Supreme Court affirmed all three death sentences on statutorily-mandated direct appeal. Washington v. State, 362 So.2d 658 (Fla.1978), cert. denied, 441 U.S. 937, 99 S.Ct. 2063, 60 L.Ed.2d 666 (1979).
 
 
 101
 On March 19, 1981, petitioner, with different counsel, moved for post-conviction relief in the Dade County Circuit Court pursuant to Fla.R.Crim.P. 3.850.[6] Since the sentencing judge, Richard Fuller, had retired, Circuit Judge Mario Goderich heard the motion. The core of this collateral attack on the death sentences was that Tunkey's failure to investigate and adduce mitigating evidence at the sentencing hearing denied petitioner his constitutional right to the effective assistance of counsel.
 
 
 102
 Petitioner's motion incorporated all the mitigating evidence that he alleged was incompetently omitted at his sentencing hearing. Although he did not attempt to show that sentencing profiles similar to the one he presented in his motion had received life imprisonment in the past,[7] he did offer psychiatric evidence of his broken and violent home, one marked by extensive child abuse and incest; his panic, frustration, and depression at his economic circumstances; and his remorse for his crimes. He also offered affidavits from family, friends, former employers, and teachers. These affidavits portrayed a young man under intense emotional pressure because of his inability to provide for himself, his wife, and his infant. They described petitioner as responsible and nonviolent, active in his church, and devoted to his family. They also emphasized that there was an inexplicable difference between the person the affiants knew and the one who committed these crimes. The affiants stated that they would have testified at the sentencing hearing but were never contacted for that purpose.[8]
 
 
 103
 After reviewing the record and hearing arguments of counsel, but without holding an evidentiary hearing, the court denied all relief on March 27, 1981.[9] In so doing, the court assumed arguendo that the allegations of petitioner's motion and the affidavits he presented in mitigation were true but held, nonetheless, that he failed to establish a prima facie showing of prejudice arising from ineffective assistance of counsel, which showing is a necessary component of a claim of ineffectiveness.[10] In effect, the court dismissed the motion for failure to state a claim on which relief could be granted. The court stated that
 
 
 104
 as a matter of law, the record affirmatively demonstrates beyond any doubt that even if Mr. Tunkey had [presented the new mitigating evidence] at the time of the sentencing, there is not even the remotest chance that the outcome would have been any different. The plain fact is that the aggravating circumstances proved in this case were completely overwhelming, and that even to this date the Defendant cannot show that any statutory mitigating circumstances existed. The non-statutory mitigating circumstances which he claims his attorney failed to investigate and present at the time of sentencing would as a matter of law, be insufficient to outweigh the multiple aggravating circumstances present in this case.
 
 
 105
 Order Denying Post-Conviction Relief Filed Pursuant to Fla.R.Crim.P. 3.850 at 12 (emphasis in original).
 
 
 106
 On April 6, 1981, the Florida Supreme Court affirmed this denial of relief, concluding that "[appellant's] claims are shown conclusively to be without merit so as to obviate the need for an evidentiary hearing.... * [W]e can find no prejudice caused to appellant, even if we assume that every allegation he has made in his petition is true." Washington v. State, 397 So.2d 285, 286 (Fla.1981).
 
 
 107
 B. The Federal Habeas Corpus Proceedings.
 
 
 108
 The same day the Florida Supreme Court handed down its decision, two days prior to his scheduled execution, petitioner applied to the federal district court for a writ of habeas corpus. He presented the same ineffective assistance of counsel claim he had presented in state court. On April 7, the district court conferred with counsel to determine whether an evidentiary hearing would be necessary and thus a temporary stay of execution. The court inquired whether the Dade County Circuit Court had held an evidentiary hearing on petitioner's claim, and, if so, which issues had been resolved.[11] The state replied that the state court had denied petitioner's claims on the pleadings, without an evidentiary hearing, concluding as a matter of law that petitioner had failed to allege a sixth, and fourteenth, amendment violation. Petitioner's counsel insisted that the court had to hold an evidentiary hearing to dispose of each element of petitioner's claim. The state noted that petitioner's habeas petition, including his allegation of prejudice, merely replicated the Fla.R.Crim.P. 3.850 motion, which the state court had denied on the pleadings. It urged the court therefore to dismiss the petition without a further hearing, for failure to state a claim on which relief could be granted. The district court concluded this conference with counsel without ruling on the sufficiency of the petition. Shortly thereafter, the court notified counsel that it would convene an evidentiary hearing on April 10.
 
 
 109
 When the hearing began on April 10, the court announced that it was going to expedite the proceedings. As a starting point,[12] the court stated that it would consider the mitigating evidence that petitioner contended his trial counsel should have produced at the sentencing hearing. The court stated that it would receive that evidence in the form of the affidavits and psychiatric reports attached to the habeas petition. Record, vol. 2, at 4-5. It is worth emphasizing that these affidavits and psychiatric reports were identical to those the state collateral attack court had considered and rejected. The court would not, however, permit the affiants to testify. Petitioner's counsel objected to this procedure and argued that the affidavits were merely illustrative and did not contain everything the affiants and others would say in mitigation of the death penalty if permitted to testify in open court. The court overruled this objection, and instructed counsel to proceed with his case.
 
 
 110
 Counsel then called petitioner's trial attorney, William Tunkey, to the stand. Tunkey testified that the court had appointed him in October 1976 to represent petitioner against charges that petitioner had kidnapped and murdered Frank Meli. He then testified that after seeing his client's confessions he "had a hopeless feeling," id. at 22, and that "the investigation ..., the work that was done to locate prospective witnesses to testify on his behalf [was] minimal and that is using hindsight." Id. at 25-26. Tunkey stated that his knowledge of the sentencing judge, Judge Richard Fuller, dictated his trial strategy for the sentencing hearing. Tunkey believed that Judge Fuller respected a defendant who candidly admitted his guilt. Therefore, Tunkey presented his client's case in a manner that he thought would convince the judge that the defendant had pled guilty to all charges with candor and sincerity.[13]
 
 
 111
 Petitioner rested his case after Tunkey's testimony, and the state moved for an involuntary dismissal, under Fed.R.Civ.P. 41(b). The court announced that it would defer ruling on the motion until the close of all the evidence and directed the state to proceed with its case.[14] The state's case consisted primarily of the testimony of Judge Fuller. The state presented Judge Fuller as "an expert witness with regard to his experience on the Bench." Record, vol. 2, at 80. Over petitioner's objection on relevancy and other grounds, the state elicited Judge Fuller's opinion that petitioner's new mitigating evidence would have made no difference in the sentence imposed at trial. Judge Fuller stated that the murders petitioner committed were so aggravated that even if petitioner had produced the witnesses identified in his habeas petition at the sentencing hearing and they had testified as petitioner represented they would have, it "would not have changed my opinion then nor would it have changed my sentencing were I to give it today." Id. at 96.
 
 
 112
 The district court denied the writ on the ground that petitioner had failed to prove prejudice arising from Tunkey's failure to produce mitigating evidence at the state sentencing hearing. In its opinion, the court indicated that it did not consider Judge Fuller's testimony as "determinative on the issue of prejudice" because his testimony had "the potential weakness of hindsight analysis"; nevertheless, the court reached the identical result that Judge Fuller said he would have reached. It concluded that "there does not appear to be a likelihood, or even a significant possibility that the balance of aggravating against mitigating circumstances under the Florida death penalty statute would have been altered in petitioner's favor." Record, vol. 1, at 63.
 
 
 113
 Having determined that petitioner's claim failed for lack of prejudice, the court observed that it was not required to decide whether Tunkey's performance during the sentencing phase of the criminal prosecution passed constitutional muster. Nonetheless, the court found that "Mr. Tunkey should have made an independent investigation of factors relevant to mitigation, and that such investigation would have produced generally favorable information from family, friends, former employers, and medical experts." Id.[15]
 
 
 114
 An appeal was taken, and a divided panel of this court vacated in part the district court's decision and remanded the case. Washington v. Strickland, 673 F.2d 879 (5th Cir.1982). The majority held that the district court had applied an erroneous standard to determine prejudice; the dissent argued that no prejudice could be shown under any test, and that counsel had made competent, strategic choices. The case is now before us en banc.
 
 II.
 
 115
 I now consider the degree of prejudice a petitioner must prove to obtain federal habeas corpus relief on a claim that his counsel incompetently failed to produce mitigating evidence at his state capital-sentencing trial. My discussion proceeds as follows. First, I note that there is no generally accepted test in this area. Therefore, I treat this case as one of first impression. Second, I reject the test on which the district court relied, the outcome-determinative test, for two reasons: it results in the most onerous federal intrusion on state sentencing policy, and it is incongruous with the goal underlying the right to counsel--to ensure fairness in the criminal process. Third, I reject the test the panel proposed, whether the mitigating evidence counsel failed to produce would have "altered [petitioner's trial] in a way helpful to [petitioner]," 673 F.2d at 902, because it is too vague. Finally, I propose a test that ensures fairness in the criminal process, and is neither too intrusive on state sentencing policy nor too vague: whether the mitigating evidence counsel failed to produce would have substantially or materially affected the decision-making process of a rational sentencer.
 
 
 116
 Initially, I note that "[t]he law of our circuit is as yet unclear as to the precise degree of prejudice that a defendant must demonstrate before he is entitled to habeas corpus relief on grounds that he received ineffective assistance of counsel ...." Washington v. Watkins, 655 F.2d 1346, 1362 n. 32 (5th Cir.1981), cert. denied, --- U.S. ----, 102 S.Ct. 2021, 72 L.Ed.2d 474 (1982) (emphasis in original).[16] It is clear, however, that "some degree of prejudice must be shown." Id. at 1362 (emphasis in original).[17] I now proceed to determine what that degree of prejudice should be in the case before us.
 
 
 117
 In formulating the proper standard, it is helpful to recognize the deficiencies of the two tests the federal courts have used in this case. The first is the outcome-determinative test, which the district court used. The Court of Appeals for the District of Columbia Circuit first formulated the outcome-determinative test in United States v. Decoster, 624 F.2d 196 (D.C.Cir.1979): "[T]he accused must bear the initial burden of demonstrating a likelihood that counsel's inadequacy affected the outcome of the trial. " * Id. at 208 (en banc; plurality opinion; emphasis added).[18]
 
 
 118
 A majority of the panel in this case rejected the outcome-determinative test because it
 
 
 119
 would require that the court hearing the ineffective assistance claim put itself in the place of the trial-court factfinder in an attempt to predict with some considerable degree of accuracy what that factfinder would have done had it been presented with different evidence. We think that a framework for analysis which would inevitably require us, in determining whether the petitioner has made out a prima facie case for habeas relief, to engage in such highly speculative re-creations and revisions of trial court proceedings is to be avoided rather than embraced.
 
 
 120
 Washington v. Strickland, 673 F.2d at 901.[19]
 
 
 121
 An even more important reason for rejecting the outcome-determinative test is its invidious effect on the state sentencing process. As I discuss supra Part I, in Florida the decision whether to impose the death penalty involves a three-step process. First, the sentencer finds aggravating and mitigating circumstances, and weighs them to arrive at a sentencing profile.[20] Second, the sentencer examines cases presenting profiles similar to petitioner's to find the relevant state sentencing policy. Third, the sentencer applies the state policy to petitioner's sentencing profile, and decides whether the death penalty should be imposed. This process results in a normative determination whether the circumstances of the crime and the characteristics of the defendant warrant a sentence of life imprisonment or of death. This norm, which embraces the given sentencing profile, then becomes a part of the state sentencing policy to which other sentencers must look in the future.
 
 
 122
 As applied in this context, the outcome-determinative test requires the federal habeas judge to determine whether the omission of certain evidence in petitioner's state sentencing trial substantially affected the outcome of that trial. This determination requires the habeas judge to engage in the three-step process described above, and thus to forecast the appropriate sentence in light of the new evidence. The federal habeas judge must, therefore, promulgate state sentencing policy. Although the state would always be free to reject the federal judge's determination of such policy, the federal judge still would have entered a provisional sentencing norm. The existence of such provisional sentencing norms could lead to some truly anomalous results, as the following two examples show.
 
 
 123
 First, posit that a federal habeas judge denies the writ of a petitioner sentenced to death because he concludes that the new evidence would not have affected the outcome of petitioner's sentencing trial. In so doing, the court must have found that the applicable state sentencing policy, which takes into account the new evidence, requires that petitioner receive the death sentence. Now, posit a second case, this one in state court, which presents a sentencing profile identical to the one the petitioner presented in federal court. Clearly, the state is free to reject the federal judge's interpretation of state sentencing policy and sentence the defendant to life imprisonment. If, however, the state court imposes such a sentence, the unbelievable result is that a federal court has upheld a death sentence on the basis of a provisional norm which the state later rejects as an erroneous forecast of state sentencing policy. This court must not adopt a test that might produce such a result.
 
 
 124
 A second example further shows the anomalous results of using an outcome-determinative test. Posit a federal habeas judge who grants the writ of a petitioner sentenced to death because the new evidence requires the application of state sentencing policy that calls for a sentence of life imprisonment. Now, posit that a resentencing trial occurs in state court. There, the state court considers the identical sentencing profile that the habeas judge considered. As in the first example, the state sentencer is free to reject the federal court's promulgation of a temporary state sentencing norm and to sentence petitioner to death. If the state sentencer does impose the death penalty, the federal court's provisional decision may create needless confusion, and a perception of injustice arising from the conflicting decisions of two courts.
 
 
 125
 Because the outcome-determinative test could produce these inconsistent results, it must be rejected. This court cannot countenance any test for prejudice that requires the federal courts to intrude so deeply into the promulgation of state sentencing norms, an area in which the state courts have the primary authority.[21] The result of allowing the federal judiciary to intrude on such an area is that the federal courts must make provisional forecasts of state sentencing norms. As the above examples illustrate, such provisional decision making must be avoided.[22]
 
 
 126
 The outcome-determinative test must also be rejected because it is incongruous with the rationale underlying the right to counsel. The Supreme Court recently stated this rationale in United States v. Morrison, 449 U.S. 361, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981): "The Sixth Amendment provides that an accused shall enjoy the right 'to have the assistance of counsel for his defense.' This right, fundamental to our system of justice is meant to assure fairness in the adversary criminal process." Id. at 363, 101 S.Ct. at 667. The Supreme Court has thus intimated that the test for determining prejudice arising from the ineffective assistance of counsel should focus on whether the fairness of the "adversary criminal process" was affected. Thus, we should not adopt a test that measures prejudice by looking to the outcome of the criminal proceeding, as opposed to the fairness of the proceeding itself, because such a test focuses on the wrong issue and therefore is not suited to achieving the underlying goal of the right to counsel. For the reasons described above, we must reject the outcome-determinative test as the standard for determining prejudice in federal habeas proceedings.
 
 
 127
 In rejecting the outcome-determinative test, the panel suggested an alternative: "this prejudice requirement is satisfied by demonstrating that but for his counsel's ineffectiveness his trial, but not necessarily its outcome, would have been altered in a way helpful to him.... [T]he change [in the trial] must be something more than insubstantial or de minimus. See Washington v. Watkins, 655 F.2d at 1362, n. 32 ...." 673 F.2d at 902. This standard is, however, also problematic. It is vague in the extreme and, therefore, of little utility. It simply provides no standard at all to guide courts in assessing prejudice. Any additional evidence would alter a trial somewhat; what constitutes more than insubstantial or de minimus alteration is obscure. Therefore, this test too must be rejected.
 
 
 128
 Having described the shortcomings of the tests proposed thus far, it is clear that the proper standard for determining prejudice must satisfy the following concerns: it must provide the courts with some definitive guidance to assess prejudice; it must be responsive to the goal of ensuring "fairness in the adversary criminal process"; and it must not require the federal courts to engage in provisional decision making. I believe the following test satisfies these concerns: to show prejudice in a case like the one before us petitioner must prove that the decision-making process of a rational sentencer would have been substantially or materially altered had counsel properly produced the omitted mitigating evidence.[23] If the district court determines that the new evidence would not have made a substantial difference on the decision-making process of the state sentencer, the prejudice test is not satisfied.
 
 
 129
 This test provides the federal courts with definitive guidance because it requires them not merely to determine whether the trial process was "affected," but whether it was "substantially affected." Although such terms as "substantial" and "material" still do not attain the level of guidance desired, they are terms which courts apply daily in testing abstract concepts. Moreover, these terms become more meaningful when applied in light of the underlying goal of ensuring fairness in the criminal process. As such, this test provides the federal courts with as much guidance in assessing prejudice as is possible in this area. This test also properly focuses on the trial process, rather than on its outcome. Therefore, it is responsive to the goal of ensuring a fair criminal process, the underlying purpose of the right to counsel. Finally, because this test does not require the court to concern itself with the outcome of a hypothetical case, the court need not engage in provisional decision making. In sum, the test remedies the shortcomings of the tests previously discussed.
 
 III.
 
 130
 Having articulated the proper standard for determining prejudice, I now explain how a federal habeas court must apply it. The overriding message of this explanation is that because prejudice must be determined as a matter of state law, the court must first identify the relevant state sentencing profiles and norms applicable to petitioner's case. Furthermore, once it is understood that a court can determine prejudice only by discerning state sentencing policy, it becomes clear that if state courts clearly articulate such policy and if federal courts are sensitive to dismissing unexhausted petitions, no room is left for federal courts to interfere with such policy. In fact, the prejudice test I propose need be applied only when the state collateral attack court has failed to articulate clearly the state sentencing policy applicable to the sentencing profile petitioner has presented to the federal court. Thus, a major concern the state has expressed in this case, that of federal court intrusion on state sentencing policy, is addressed. I now discuss these points in greater detail.
 
 
 131
 I begin my analysis by observing that the question of prejudice from counsel's failure to produce mitigating evidence is a question of determining the effect the omitted evidence would have had on the original sentencer. Of course, no collateral attack court can say with certainty what this effect would have been. It simply cannot read the mind of a hypothetical sentencer in a hypothetical case. The best the court can do is look to those considerations the sentencer would have looked to had it been presented with the omitted evidence. By examining the same considerations the sentencer would have examined, the court is able to make a rough judgment how the new evidence would have affected the sentencer.
 
 
 132
 As I discuss in Parts I and II supra, in Florida the decision whether to impose the death penalty involves a three-step process. First, the sentencer considers all the relevant evidence presented concerning the offense and the offender. The sentencer evaluates this evidence and arrives at a sentencing profile.[24] Second, the sentencer looks for other sentencing decisions presenting sentencing profiles similar to the one before it. From these decisions, it gleans the state sentencing norms promulgated in those cases. Third, having determined both the sentencing profile in the case before it and the relevant policy as expressed in norms, the sentencer applies the policy to the profile and arrives at its decision. This decision involves the sentencer's judgment about how clearly state policy addresses defendant's case. If state policy is clear, the sentencer has less discretion within which to impose its sentence. If state policy is unclear, however, because the sentencing profile before it is materially different from those presented to state sentencers in previous cases, the sentencer has more discretion within which to make its sentencing decision. In making its decision, the sentencer promulgates a new sentencing norm which becomes part of state sentencing policy.
 
 
 133
 Once the above description of the sentencing process is understood clearly, the task of federal courts in deciding the issue of prejudice in connection with claims of ineffective assistance of counsel based on counsel's failure to produce evidence becomes simple. The federal court must go through the first two steps just as the original sentencer would have done. First, it identifies the sentencing profile petitioner claims he would have presented to the sentencing court had his counsel not been incompetent. It does this by starting with the profile the sentencer described when it imposed sentence, and then altering that profile to account for the omitted evidence.
 
 
 134
 Having identified the profile, the court next engages in the second step--finding those profiles similar to petitioner's in order to find what sentencing norms were applied to those profiles. As I discuss in more detail in this Part infra, if petitioner has presented his new profile to the state collateral attack court, therefore exhausting his claim, the federal court should have to look no further than the state collateral attack court's dispositive order to find the norm governing petitioner's case. Thus, if that state court has articulated this norm clearly, the federal court's task in engaging in the third step becomes simple.
 
 
 135
 At the third step the similarity between the role of the sentencer and that of the federal court ends. The federal court has no role in determining whether existing state sentencing policy dictates the outcome in a petitioner's case. This is a state policy determination and, as I discuss in Part II supra in rejecting the outcome-determinative test, an area into which federal courts must not intrude. Rather, under the test I propose, the federal court's role is to determine only whether state sentencing policy is clear enough that the sentencer would have had no substantial discretion to impose a sentence of life imprisonment. If the state policy leaves the sentencer with substantial discretion to impose either a sentence of death or of life imprisonment, the federal court must find that prejudice exists. In practical terms, this is what I mean when I say that prejudice exists when the new evidence would have materially altered the decision-making process of a rational sentencer.
 
 
 136
 Having described the way in which the federal court applies the test for prejudice in terms of three concrete steps, my next observation is that if the state courts clearly articulate state sentencing policy and if federal courts are sensitive to dismissing unexhausted habeas petitions, the federal court's performance of the third step is simple. In approaching the third step, one of three things should become obvious to the federal habeas judge: he must dismiss petitioner's claim because state policy, as promulgated by the state collateral attack court, is clear that death is the appropriate sentence; he must proceed to make the determination dictated by the third step because the state collateral attack court has not clearly articulated state sentencing policy; or he must dismiss the petition because petitioner has presented an unexhausted claim. Only in the second scenario is the federal habeas court forced to apply the prejudice test I propose and thus engage in the potentially difficult canvass of state sentencing policy the test dictates. The occurrence of this scenario is, however, within the state's power to prevent. This becomes apparent when one realizes the function of the state collateral attack court in resolving the issue of prejudice. I review this function briefly before returning to a discussion of these three scenarios.
 
 
 137
 In deciding a claim of attorney incompetence based on counsel's failure to produce evidence, the state collateral attack court must also engage in a three-step process to determine whether the petitioner was prejudiced. The first two steps are identical to those performed by the state sentencer and the federal habeas judge: the court must find the offense and offender characteristics and describe the new sentencing profile the petitioner presents and it must identify the sentencing norms promulgated in similar cases. The crucial distinction for our purposes between a state collateral attack court and a federal collateral attack court becomes apparent at the third step. At this stage, the state collateral attack court acts like the original state sentencer in the sense that it promulgates state sentencing policy by discerning the norm in the case before it. This norm becomes part of the state sentencing policy the federal court must look to in engaging in its third step.[25]
 
 
 138
 Once it is understood that state collateral attack courts play a crucial role in promulgating state sentencing policy, it becomes clear that the federal court should have to look no further than the state collateral attack court's promulgation of state policy to find the norm controlling petitioner's case. Therefore, the federal court need not engage in the sensitive canvass of state policy the third step might otherwise have called for. The simplest way to demonstrate this point is to consider the three ways in which a claim such as the one petitioner here presents can come to federal court.
 
 
 139
 The first possible scenario is that the petitioner, in alleging prejudice, presents the same sentencing profile to the federal court as he did to the state collateral attack court, and the state collateral attack court has clearly articulated state sentencing policy in determining that petitioner had failed to prove prejudice. In making that determination, the state collateral attack court decided that the death penalty is required in a case presenting the petitioner's new sentencing profile. This interpretation of state sentencing policy is binding on the federal court. Consequently, the petitioner cannot possibly sustain his allegation of prejudice in federal court. The federal court must deny the claim because it has identified the state sentencing policy that directly controls petitioner's case and this policy dictates the penalty of death. As I discuss in Part IV infra, this scenario occurred in this case, but the district court failed to realize that its decision was dictated by clear state policy.
 
 
 140
 The second possible scenario occurs when the federal court is presented with the identical sentencing profile presented to the state collateral attack court, and the state court has denied petitioner's claim without clearly articulating state sentencing policy. For example, the state court may have denied petitioner's claim without giving reasons therefor.[26] Thus, the federal court would be unable to discern whether the petitioner failed to prove prejudice or incompetence or both. Because it could not tell whether petitioner proved prejudice, it would have to engage in its own determination of prejudice without the benefit of a clearly controlling state norm. Obviously, this determination should be avoided if possible. Fortunately, it can be avoided easily enough if state collateral attack courts carefully and clearly articulate sentencing policy in their decisions. This second scenario is, therefore, within the state collateral attack court's power to prevent.
 
 
 141
 The final scenario occurs when the petitioner comes to federal court with a sentencing profile materially different from that presented to the state collateral attack court.[27] The state collateral attack court has therefore not been given the opportunity to apply state sentencing policy to the profile petitioner presents to the federal court. Because the state has not been given this opportunity, the federal court must dismiss the claim for want of exhaustion. Thus, if the federal court is sensitive to dismissing unexhausted claims, this third scenario can be avoided.[28]
 
 
 142
 In sum, I have described how the state sentencing court, the state collateral attack court, and the federal habeas court all engage in a three-step inquiry, to impose sentence in the case of the first court, and to determine prejudice in the case of the latter two courts. Although the first two steps are the same for all three courts, the third step varies among them. It is this crucial third step which may present difficulty for federal courts. This difficulty can be, however, avoided. Federal courts can dismiss unexhausted claims. State collateral attack courts can do their part by clearly articulating state sentencing policy.[29] Through this cooperative effort among federal and state courts much needless and detrimental litigation can be avoided.
 
 
 143
 I now turn to the errors the district court committed in this case.
 
 IV.
 
 144
 In addition to applying the wrong test for prejudice, the outcome-determinative test, the district court committed three fundamental errors, each of which alone constituted reversible error. Before examining these errors, I note that each error arose from the court's failure to apply the three-step process I have described in Part III supra. To reiterate, first the district court should have identified petitioner's sentencing profile. Second, it should have discerned the relevant state sentencing policy. Third, it should have determined whether state policy was such that the sentencer would have had substantial discretion to impose a life sentence. Had the district court engaged in this process, it most likely would not have committed the errors described below.
 
 
 145
 The first ruling in which it was essential that the district court engage in the above process, but failed to do so, was its ruling, implicit in the scheduling of an evidentiary hearing, that the petitioner stated a claim of prejudice arising from counsel's alleged incompetence.[30] Had the court engaged in the three-step process described above, it would have realized that petitioner alleged the same sentencing profile that the state collateral attack court had held warranted the death penalty. As I discuss supra Part I, the state collateral attack court stated that
 
 
 146
 as a matter of law, the record affirmatively demonstrates beyond any doubt that even if Mr. Tunkey had [presented the new mitigating evidence] at the time of the sentencing, there is not even the remotest chance that the outcome would have been any different. The plain fact is that the aggravating circumstances proved in this case were completely overwhelming, and that even to this date the Defendant cannot show that any statutory mitigating circumstances existed. The non-statutory mitigating circumstances which he claims his attorney failed to investigate and present at the time of sentencing would as a matter of law, be insufficient to outweigh the multiple aggravating circumstances present in this case.
 
 
 147
 Order Denying Post-Conviction Relief Filed Pursuant to Fla.R.Crim.P. 3.850 at 12 (emphasis in original). The Florida Supreme Court affirmed this denial of relief, concluding that "[appellant's] claims are shown conclusively to be without merit so as to obviate the need for an evidentiary hearing.... [W]e can find no prejudice caused to appellant, even if we assume that every allegation he has made in his petition is true." Washington v. State, 397 So.2d 285, 286 (Fla.1981).
 
 
 148
 Because the state collateral attack court's normative decision, as affirmed by the Florida Supreme Court, that death was the appropriate sentence for petitioner based on his sentencing profile, is binding on federal courts, the district court should have held that petitioner could not possibly sustain his claim of prejudice. The norm as promulgated by the state collateral attack court governed petitioner's alleged sentencing profile and dictated a sentence of death. The district court should have, therefore, dismissed the petition for failure to state a claim for relief.[31] Its holding of an evidentiary hearing was its first error.
 
 
 149
 Having improperly determined that an evidentiary hearing was necessary, the court committed its second error during the hearing when it prevented petitioner from introducing all of his evidence on prejudice. Instead, the court relied only on the affidavits and psychiatric reports petitioner provided in support of the petition. As I noted in Part I supra, the petitioner's counsel objected to this procedure and argued that the affidavits were merely illustrative and that he would call additional witnesses to testify on mitigation. Petitioner thus needed to introduce all of his evidence to establish his sentencing profile, from which he would then argue prejudice. Without engaging in the first step, determining petitioner's sentencing profile, the court's search for the relevant sentencing policy from which it could evaluate the petitioner's claim of prejudice, was impossible. Because the court did not understand the three-step process and thus the importance of the evidence petitioner sought to introduce to the proper resolution of the first step, it excluded the evidence. In so doing, the court ruled on the issue of prejudice by looking at an incomplete sentencing profile presumably different from that which petitioner alleged competent counsel would have established at his state sentencing trial. This clearly was error; the court should have provided petitioner the opportunity to establish his alleged sentencing profile.[32]
 
 
 150
 The court committed its third error when it allowed the original state sentencing judge, Judge Fuller, to testify at the hearing on the issue of prejudice. The inadmissibility of Judge Fuller's testimony is obvious when one considers the three-step process described above. Each step of the process involves questions the federal habeas court is competent to decide independently. A federal habeas court can hear evidence and find the sentencing profile petitioner alleges his counsel should have presented to the state sentencer. It can examine the findings of fact and conclusions of law of sentencers, see Fla.Stat. Sec. 921.141(3), and collateral attack courts, and the decisions of the Florida Supreme Court, to identify the relevant sentencing policy. Finally, it can compare this policy with petitioner's profile and determine whether the new evidence would have materially altered the decision-making process of the sentencer.
 
 
 151
 I can see no reason why Judge Fuller's testimony would be admissible in the district court on any of these issues. The first two questions are factual, and the district court can find these facts from the record evidence the parties adduce without the assistance of an expert witness. The third question is one of mixed law and fact, and the district court is capable also of making this determination. Judge Fuller's "expert" testimony would be admissible only if the decision maker, here, the federal habeas court, is untrained or unqualified to determine the issues presented to it. See Fed.R.Evid. 702. Obviously, the federal habeas court is trained in the law and qualified to make the decisions required to determine prejudice. Because Judge Fuller's opinion testimony was unnecessary, I agree with the majority's holding that it was inadmissible under Federal Rule of Evidence 702.
 
 V.
 
 152
 In light of the errors described above, I would remand this case to the district court for proceedings not inconsistent with this opinion. Specifically, if the district court determines that petitioner presents the same sentencing profile to it as it did to the state collateral attack court, it must deny petitioner's claim of ineffective assistance of counsel. If, on the other hand, it determines that petitioner advances a sentencing profile materially different from that which he presented to the state collateral attack court, it must dismiss the petition for want of exhaustion.
 
 THOMAS A. CLARK, Circuit Judge, concurring:
 
 153
 I concur in Judge Tjoflat's opinion except for the remand instructions. I would ask the district court to conditionally grant the writ subject to the state court holding an evidentiary hearing to permit introduction of Washington's mitigating circumstances evidence. The state court should determine, not a federal court, whether such evidence tilts the scales to a life sentence. The only problem with this case is that no Florida court has heard and considered the evidence. The affidavits were not a substitute for evidence and were filed for the purpose of securing a hearing. A hearing by a Florida court would bring this case to a speedy conclusion.
 
 
 154
 FRANK M. JOHNSON, Jr., Circuit Judge, joined by ANDERSON, Circuit Judge, concurring in part and dissenting in part:
 
 
 155
 This Court today holds that a habeas petitioner must show that his counsel's ineffectiveness causes "actual and substantial disadvantage" to the conduct of his defense. If the petitioner meets this burden, the state may rebut by showing "in the context of all the evidence that it remains certain beyond a reasonable doubt that the outcome of the proceedings would not have been altered but for the ineffectiveness of counsel." 693 F.2d at 1262 (emphasis in original). Rather than discussing the application of this standard to the facts of the case before us, Judge Vance would simply remand the case to the district court, citing Pullman-Standard v. Swint, --- U.S. ----, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982). I concur with Parts I, IIA, and IIIA-C of Judge Vance's opinion, particularly in its discussion of the standard for determining effectiveness of counsel and the degree of prejudice required. I also conclude, as Judge Vance does, that this case should be remanded to the district court for further proceedings under the standards described in Parts II and III. I dissent, however, from Part IIB of his opinion, which concludes that the record and district court's findings in this case do not permit us to reach a conclusion as to whether counsel was effective. I also dissent from Part IIID, which holds that a remand is necessary to determine whether the petitioner sustained his burden of showing prejudice. I conclude that the district court's findings of fact clearly support the conclusion that counsel was ineffective. In addition, the district court's findings require the conclusion that counsel's ineffectiveness "caused actual and substantial disadvantage to the conduct of [the petitioner's] defense." 693 F.2d at 1250. Thus, I would not remand for further hearings on either of these issues. I would, however, remand this case to the district court to permit the state to attempt to rebut the petitioner's showing of prejudice.
 
 
 156
 The district court found the following facts. According to the uncontradicted testimony of Mr. Tunkey, Washington's lawyer at the sentencing hearing, Tunkey "made no active effort to bring in witnesses to testify on petitioner's behalf regarding his childhood, family ties, or financial problems."[1] After Washington's wife and mother "failed to show" for an appointment with Tunkey (the court did not make clear who had arranged the meeting), Tunkey "did not seek them out."[2] The district court found that "it is evident that Mr. Tunkey should have made an independent investigation of factors relevant to mitigation, and that such investigation would have produced generally favorable information from family, friends, former employers, and medical experts."[3] The court found further that this failure to investigate constituted an "error in judgment."[4]
 
 
 157
 The district court also recited testimony from Tunkey to the effect that Tunkey "couldn't say that [his failure to request a presentence investigation] was a trial strategy."[5] The court found that Tunkey testified that "he felt [the investigation] would possibly be more detrimental than helpful,"[6] but the district judge below clearly rejected this fear as unfounded: "It is evident from Mr. Tunkey's testimony," the judge wrote, "that he was concerned that such a report could also prove detrimental. Nonetheless, in light of the generally supportive affidavits filed in this case [from family members, neighbors, and friends], it is evident the report may have provided additional independent information in mitigation of the aggravating circumstances previously shown."[7] In fact, the real reason found by the court for Tunkey's failure to investigate had nothing to do with strategic reasoning or evaluation of the information that might have been obtained in an investigation. Instead, the court found that Tunkey simply gave up:
 
 
 158
 It is evident that in the instant case, Mr. Tunkey's judgment was affected by the evidence of Washington's guilt and his desire to plead guilty. Mr. Tunkey candidly admitted that once multiple confessions were given, he had a feeling that nothing could be done to save Washington and that this feeling was behind his failure to do an independent investigation into petitioner's background and potentially mitigating emotional and mental reasons for the killings.[8]
 
 
 159
 The court earlier characterized Tunkey's feeling as one of "hopelessness."[9] Thus, the court plainly accepted Tunkey's uncontradicted testimony that his failure, among other things, to request a presentence investigation report was not strategy.
 
 
 160
 Tunkey did pursue a strategy of "attempt[ing] to convince the [sentencing] judge of Washington's sincerity and frankness in pleading guilty" on the ground that the judge might consider such a fact favorably in his sentencing decision.[10] But the defense strategy clearly was not to pursue this course at the expense of others. The district court noted that the sentencing judge also had before him evidence as to Washington's background and possible mental and emotional reasons for the killings; Washington apparently had made statements to this effect during the plea colloquy.
 
 
 161
 Finally, in a subsequent Order Denying Motion for Rehearing or New Trial [hereinafter "retrial order"], the same district court judge found that an April 1981 psychiatrist's report "provides the first indication that evidence may exist which shows that at the time of the offenses, defendant was under the influence of extreme mental or emotional disturbance or that he was unable to conform his conduct to the requirements of law."[11] Further, the district court found that the report shed light on factors (b) and (f) of the mitigating circumstances enumerated in Florida's death penalty statute.[12] See Fla.Stat.Ann. Sec. 921.141(6) (West Supp.1982).
 
 
 162
 These findings clearly support the conclusion that counsel was ineffective and that this ineffectiveness caused actual and substantial disadvantage to the petitioner's defense. Part IIA of Judge Vance's opinion correctly establishes the general proposition that, if counsel makes a reasonable strategic choice to rely upon one plausible line of defense at trial, his failure to conduct a substantial investigation into another plausible line of defense does not constitute ineffective assistance. 693 F.2d at 1254 1256. But when counsel for "no strategic reason" fails to conduct a substantial investigation into a plausible line of defense, the attorney fails to render effective assistance. 693 F.2d at 1257 - 1258. Thus, this case turns on the question whether counsel made a strategic choice, and, if so, whether his strategy was reasonable.[13]
 
 
 163
 Three elements of the district court's findings of fact point to the conclusion that counsel's failure to investigate had nothing to do with strategy.[14] I review these elements considering only the findings of fact as described in the district court opinion, reserving for independent judgment the ultimate determination of whether counsel's actions constituted ineffective assistance. See Pullman-Standard, supra, 102 S.Ct. at 1788 n. 16.
 
 
 164
 First, although a counsel's action in failing to investigate is presumed strategic, "[t]his presumption can be rebutted ... when trial counsel testifies credibly at an evidentiary hearing that his choice was not strategic." 693 F.2d at 1257. The district court cited just such testimony from Tunkey, in which he "couldn't say that [his failure to request a presentence investigation] was a trial strategy."[15] Moreover, given the district court's explicit finding that the reason for Tunkey's noninvestigation was his feeling of hopelessness, it is difficult to contemplate what more the district court must find on remand in order to conclude that strategy was irrelevant to his inaction.
 
 
 165
 Second, a presumption that counsel's action was strategic "can be rebutted ... when certain of counsel's actions do not conform to a general pattern of rational trial strategy." 693 F.2d at 1257-1258. Under certain circumstances, it may be rational trial strategy to elect one course of investigation at the expense of another--particularly when two potential courses are inconsistent. See 693 F.2d at 1256 n. 23. In the case before us, however, Tunkey's strategy of relying on Washington's "sincerity and frankness" in pleading guilty would have been wholly consistent with a course of explaining to the sentencing judge his behavior by putting before the court Washington's background and circumstances. "When the lines of defense are consistent so that both could be presented at trial," Judge Vance's opinion suggests, "there may be a less compelling reason not to have pursued both prior to trial." Id. In the present case, the district court found no compelling reason and the record contains none. Hopelessness certainly is not a compelling reason.[16]
 
 
 166
 Third, analysis of the defenses actually offered to the sentencing judge confirms that Tunkey did not make a strategic decision to avoid the issue of Washington's background and circumstances. As indicated earlier, the sentencing judge heard just such evidence from Washington himself. Although this line of defense was weakly supported in the absence of evidence from family, friends, and neighbors, the government is hard pressed to argue that Tunkey pursued a "reasonable strategy" of not attempting to explain Washington's actions.[17]
 
 
 167
 Each of these considerations leads to the conclusion that Tunkey's action--or inaction--was not motivated by strategy, and thus that counsel was not effective. Yet Judge Roney in his dissent would have this Court hold that counsel was effective, apparently on the ground that Tunkey made a tactical decision to appeal to Judge Fuller's appreciation for those who make unqualified admissions of guilt. Such an argument misses the basic question at issue in this appeal. As I have already suggested, Tunkey easily could have pursued his strategy of appealing to Judge Fuller and, without undermining the effectiveness of that strategy, could have at the same time investigated Washington's background. The point is that, while Tunkey's approach to Judge Fuller certainly was strategy, his failure even to investigate other consistent defenses was not. Tunkey himself claimed only that his approach to the sentencing judge was strategy. He never claimed that his non-investigation was based on strategy; the court's opinion below even stated that Tunkey had testified that he could not say it was strategy. Given the circumstances, it is difficult to imagine how Tunkey could have honestly testified otherwise--and to his credit he did not.
 
 
 168
 More disturbing about Judge Roney's dissent, however, is its emphasis on the theory that this Court should consider the issue of effectiveness of counsel "with[ ] a full understanding as to what counsel was up against when Washington pled guilty to those brutal acts." By cataloging in detail what were clearly atrocious and shocking crimes, and by suggesting that we view counsel's omissions and errors in the context of these crimes, the implication is that somehow our standard of review for constitutional error should be more lenient when the crime is more serious. Defense counsel has a sacred, professional duty to represent his client zealously. Particularly in death penalty cases, we should not turn our heads because a lawyer, however qualified and experienced, felt a sense of hopelessness when faced with a difficult case. Otherwise, we would abandon our duty as judges to ensure that all defendants--not just those who commit non-brutal crimes--receive full due process protections and effective assistance of counsel.
 
 
 169
 Having concluded that Washington was deprived of effective assistance of counsel, I also conclude that the district court findings establish that the ineffectiveness caused actual and substantial disadvantage to the conduct of Washington's defense. I find clearly sufficient the court's repeated findings that an independent investigation might have uncovered supportive evidence.[18] Also probative of this issue is the court's characterization of the April 1981 psychiatrist's report. In the rehearing order, the court stated that the report indicated that the petitioner was "under the influence of extreme mental or emotional disturbance or ... was unable to conform his conduct to the requirements of law." The court went on, however, to determine that "there is insufficient basis to conclude that findings consistent with [the April 1981] report would have been available to counsel" had he investigated in 1976. Because this Court holds that a petitioner need not prove a probable effect on the outcome of his case, the district court's latter finding was based on an excessively strict legal standard. Regardless of whether the 1981 report actually would have been available the first time, it is enough under the standard enunciated today that the existence of such a report indicates generally the extent and nature of counsel's omissions. When evidence of obvious importance might have been available in a case involving a question of life or death, and counsel decided, because of a feeling of "hopelessness," not to independently investigate Washington's background at all, it is difficult to imagine greater possible disadvantage to Washington.
 
 
 170
 Thus, the district court's findings of fact have already completely determined that counsel's ineffectiveness caused actual and substantial disadvantage to Washington's defense. Otherwise, the record "permits only one resolution of the[se] factual issue[s]," so, applying the principles of Pullman-Standard, a remand is not the proper course as to these issues.[19] I would remand only for a determination of whether the government can rebut the petitioner's showing of prejudice.
 
 
 171
 RONEY, Circuit Judge, with whom FAY and JAMES C. HILL, Circuit Judges, join dissenting:
 
 
 172
 I respectfully dissent. Neither the rehearing en banc nor the recent opinion reversing the denial of a writ of habeas corpus in this case has changed my opinion from when I dissented from the panel majority's decision of this case. Washington v. Strickland, 673 F.2d 879, 907 (11th Cir.1982). I will here merely echo what I wrote then.
 
 
 173
 I sketch again the facts because the only constitutional issue on appeal is whether the defendant had counsel at sentencing adequate to fulfill Sixth Amendment requirements. Our common knowledge tells us that there are very few attorneys in the United States who have represented a defendant who pled guilty to three such torturous, horrendous and time-related murders as these. Counsel's "effectiveness" cannot be considered without a full understanding as to what counsel was up against when Washington pled guilty to those brutal acts.
 
 
 174
 On September 20, following carefully arranged plans, Washington stabbed to death Daniel Pridgen, a minister, while an accomplice restrained the victim and covered his face with a pillow. On September 23, in the presence of her three helplessly bound elderly sisters-in-law, petitioner murdered Mrs. Katrina Birk by stabbing her and shooting her in the head. Washington thereafter attacked the sisters-in-law with gun and knife, inflicting serious, permanent injuries. Finally, on September 29, Washington murdered Frank Meli, a twenty-year-old college student whom he had kidnapped two days before. While Meli was tied spread-eagled to a bed, Washington stabbed him 11 times. Although an accomplice had covered Meli's face with a pillow, petitioner stated he heard his victim repeat the Lord's Prayer "over and over" during the fatal attack. Thus, Washington's victims included black and white, young and old, male and female, all intentionally murdered in torturous ways.
 
 
 175
 The suggestion in one of the opinions that reviewing the facts somehow indicates a lessened interest in defendant's constitutional rights misses the point. This was a sentencing hearing where the facts which established guilt were undisputed. That the facts would justify the death penalty under Florida law can hardly be questioned. Therefore counsel had to approach the case as one where mercy, not justice, was the goal. A lawyer who tried to argue that justice compels life, rather than death, might well foreclose his client's opportunity for mercy. The court confuses the issue in relying on cases involving guilt-phase trials and the requirements of lawyers in those situations. There are not here the well-accepted standards that have been developed for the guilt phase of trials. Artistry is required, not a paint-by-numbers approach to advocacy.[1]
 
 
 176
 Tunkey, Washington's court-appointed counsel, was a competent and seasoned criminal lawyer, thoroughly experienced in criminal and capital cases. Relying on his experience in prior capital cases and his familiarity with his client and the trial judge, the attorney, faced with the above undisputed facts, reached a reasoned, tactical decision as to the only course of action which he thought could result in a sentence of life imprisonment rather than a death sentence. Tunkey testified that the only strategy he believed to have a chance of success, given the predilections of the sentencing judge with whom he had become familiar in the course of his practice in the area, was the strategy he pursued.[2] Aware the judge normally responded favorably to a free, unqualified, unbargained for admission of guilt, Tunkey thought the only hope of leniency, given the nature of the crimes, was for Washington to show remorse and seek mercy.[3]
 
 
 177
 We have consistently held that counsel will not be regarded constitutionally deficient merely because of tactical decisions. See United States v. Guerra, 628 F.2d 410 (5th Cir.1980), cert. denied, 450 U.S. 934, 101 S.Ct. 1398, 67 L.Ed.2d 369 (1981); Buckelew v. United States, 575 F.2d 515 (5th Cir.1978); Williams v. Beto, 354 F.2d 698 (5th Cir.1965). Whether the tactic succeeds or fails is irrelevant. Indeed, even if the strategy chosen by counsel should appear clearly wrong in retrospect, constitutionally ineffective representation does not automatically result. Baty v. Balkcom, 661 F.2d 391, 395 n. 8 (5th Cir.1981); Baldwin v. Blackburn, 653 F.2d 942, 946 (5th Cir.1981). Only if we apply 20/20 hindsight to second guess considered professional judgments, can we quibble with Tunkey's assessment of the most efficacious strategy to employ at sentencing. See United States v. Johnson, 615 F.2d 1125 (5th Cir.1980); Easter v. Estelle, 609 F.2d 756 (5th Cir.1980). In fact, there is evidence in the record that supports Tunkey's evaluation of the sentencing judge.[4]
 
 
 178
 Moreover, there has been no showing on this record that any other strategy would have had any likelihood of dissuading the judge from imposing the death penalty. In my judgment, in the absence of some possibility that another course of action would have benefited his client, the record compels a finding that Washington's attorney was not constitutionally ineffective. A remand is a fruitless prolongation of already protracted litigation because had the district judge come to any other conclusion on this record, he would have been in error as a matter of fact and wrong as a matter of law.
 
 
 179
 As before, I dissent from the majority's striking down the Florida Supreme Court's standard for reviewing ineffective assistance of counsel claims set forth in Knight v. State, 394 So.2d 997 (Fla.1981), which followed United States v. Decoster, 624 F.2d 196 (D.C.Cir.) (en banc), cert. denied, 444 U.S. 944, 100 S.Ct. 302, 62 L.Ed.2d 311 (1979). The district court should not be reversed for following the same standard.
 
 
 180
 The Decoster formulation of the requirement to show prejudice was not that defendant bear the burden of proving actual prejudice but that "defendant must demonstrate ... a likelihood of effect on the outcome. In that event, the Government would have the burden of showing that there was in fact no prejudice in the particular case." 624 F.2d at 215. The majority would replace this rule with its own formulation based on the explication in United States v. Frady, 456 U.S. 152, 159, 102 S.Ct. 1584, 1590, 71 L.Ed.2d 816, 832 (1982), of the prejudice portion of the cause and prejudice standard required to obtain collateral relief based on trial errors to which no contemporaneous objection was made. The majority requires a defendant to show that "ineffectiveness of counsel resulted in actual and substantial disadvantage to the course of his defense," 693 F.2d at 1262, while reserving for the state "the ultimate burden of showing that any constitutional error that did occur was harmless beyond a reasonable doubt." Id. at 1262.
 
 
 181
 Once again semantics and appellate theory have been substituted for sound reasoning and real life requirements of the courtroom. How can counsel's ineffectiveness at the sentencing phase of a capital case result in actual and substantial disadvantage to the defense without some likelihood of its affecting the outcome?In my view the majority has changed the words of the prejudice requirement without changing any practical effect. Yet by changing the formulation, the Court has drawn a bright constitutional line between what the Florida Supreme Court, several district courts in this Circuit, and other courts have found constitutionally acceptable. Not one circuit has specifically rejected Decoster, some circuits have standards of review that are similar, e.g., McQueen v. Swenson, 498 F.2d 207, 220 (8th Cir.1975), and others seem to assume that where prejudice must be shown, it must run to the outcome of the proceeding about which the petitioner is complaining. E.g., United States v. Williams, 575 F.2d 388, 393 (2d Cir.), cert. denied, 439 U.S. 842, 99 S.Ct. 134, 58 L.Ed.2d 141 (1978). Surely there is room in constitutional law to permit various verbalizations. The district court here found there was no likelihood that what Tunkey could have done, but did not, would have altered the sentence.[5] That finding should be sufficient to support the court's denial of relief, no matter what standard may be developed ultimately as to the level of showing a defendant must make.
 
 
 182
 Finally, the majority would reverse because the state sentencing judge testified at the federal evidentiary hearing as to the weight he accorded mitigating and aggravating factors in the case and as to whether the evidence Washington urges would have made a difference. I would not reverse on the impropriety of the admission of that testimony. Even if the testimony were inadmissible, its admission was harmless error because there is insufficient evidence in the record to support a decision for Washington.
 
 
 183
 This record compels the decision that Washington was not deprived of constitutionally effective counsel. Even if some fault can be found in his counsel's conduct, there is no showing that it resulted in any disadvantage to Washington or that a different strategy at sentencing would have had any likelihood of affecting the sentence of the state court. I would affirm.
 
 
 184
 JAMES C. HILL, Circuit Judge, concurring in the dissenting opinion of RONEY, Circuit Judge.
 
 
 185
 Judge Vance has prepared for our court a most valuable cyclopedia on the subject of the duty of defense counsel in criminal cases to conduct investigations. It should be taught in law schools and seminars. I do not mean to detract from the value of the compilation as such. However, I dissent from the holding that, in a habeas corpus case alleging ineffective assistance of counsel the district judge's inquiry should first address the duties imposed upon counsel as articulated in Part II.
 
 
 186
 When a person in custody resulting from a criminal conviction petitions for the writ of habeas corpus asserting that his conviction was unconstitutional because, at his trial, he was not afforded adequate counsel, the issue before the court is the defense afforded him at the trial resulting in the conviction. If that trial were constitutionally conducted, there is no merit to the petition. The majority opinion shifts the inquiry, in the first instance, from the challenged trial to the challenged defense attorney. District judges are instructed that they should pay no attention to the defendant's trial until and unless they have first convicted his lawyer. Assertions by the petitioner that his lawyer failed to live up to the high standards of our profession are to be meticulously investigated and evaluated in the abstract. Every asserted act or omission of defense counsel (often, as in this case, willing to accept appointment to the case) is to be measured against the professional standards of lawyers. When the work of the lawyer has been gone over with a fine-toothed comb, and some of that work has been found to have been less than desirable, those findings are to be announced. When the lawyer has been found guilty of something less than the ideal, only then does the judge turn his attention to the defense afforded the petitioner. It then appearing that the failings of defense counsel worked no prejudice to the petitioner's defense, the petition is to be denied.
 
 
 187
 In my opinion, this stands the inquiry on its head. The petitioner is complaining that he did not receive a constitutional trial leading to a constitutional conviction. Therefore, what he alleges about his trial should be the beginning, and often ending, inquiry. The petitioner must assert that there were errors of commission or omission by his attorney which, had they not been committed, would have benefitted his defense.[1] Further, he must assert that those errors were the result of inadequate counsel. Therefore, the district court's first inquiry should be whether the claimed defense counsel defaults worked a prejudice to the defense. It should matter not to the habeas court whether or not the failure of defense counsel to have located and produced a witness was the result of incompetency if it now appears that the witness has been located and, had he been produced, would have given nothing but harmful testimony to the defense. If the petitioner gave his attorney a lead to the location of a witness who might have been of assistance, and if the attorney is said to have ignored the lead, choosing to attend an attractive social function rather than devote the time to the location of the witness, that assertion need not be investigated and evaluated by the district judge if it appears that the witness has now been located and never had any information material to the case at all. The opinion for our court authored by Judge Vance would require the district judge to ignore the result of claimed incompetency; take evidence and make findings of fact as to whether or not the lawyer did abdicate his duty to investigate the witness in favor of attending a social function; and only then take note of the fact that neither the presence or absence of the witness could have had any effect, one way or another, on the trial.
 
 
 188
 I have a sincere and abiding interest that trial counsel do their professional work according to high professional standards. However, it is not the work of the district court considering a petition for habeas corpus gratuitously to "grade the paper" of the lawyer unless it first be shown that, had the lawyer conducted the defense in the manner preferred by the petitioner, it would have benefitted the petitioner. It is, after all, the petitioner's trial and conviction that is under investigation.
 
 
 189
 I have not overlooked the departure in the majority opinion's footnote 33 from the mandate otherwise articulated in the opinion. In note 33, the majority suggests that there might be some occasions when obvious lack of prejudice would make it unnecessary to determine whether or not defense counsel's omission or commission was the result of inadequacy. I submit that what should be the rule is, in footnote 33, made the exception. District judges are hardly to be expected to find the proper procedure in that footnote contrary to the directions given in the body of the opinion, and, particularly, in its conclusion. Holdings expressed in footnotes are often given little weight. See Miree v. DeKalb County, 433 U.S. 25, 33, 97 S.Ct. 2490, 2495, 53 L.Ed.2d 557 (1977).
 
 
 190
 In the case presently under review, the district court properly pretermitted deciding whether or not the claimed omissions of attorney Tunkey amounted to incompetency or inadequacy on the part of the attorney because the district court found that no prejudice resulted from the omissions and, upon that finding, denied the writ. I should affirm that finding. I have reviewed every affidavit of the witnesses said to have been overlooked by attorney Tunkey. The absence of the testimony of those witnesses at sentencing does not demonstrate the absence of any evidence likely to have had an effect on the outcome. Some of the tendered affidavits are of potential witnesses saying that he or she was surprised that petitioner stabbed a minister to death in the minister's church; bound four elderly women and then methodically stabbed them; and, after kidnapping a young man, tied him spread-eagle on a bed and, while his face and head were covered with a pillow, stabbed him eleven times, producing his death. It is hard to conceive of a person about whom it might not be said that such conduct was surprising. Other suggested witnesses would have disproved mental condition as a mitigating circumstance while others would have testified to petitioner's need for money, thus tending to substantiate that robbery for gain accompanied these murders. Proof that these witnesses were not called, whether by choice of strategy or otherwise, does not authorize the grant of the writ and, the district court was correct in that conclusion.
 
 
 191
 I take note that the district court heard the testimony of the sentencing judge to the obvious effect that the testimony of these witnesses would not have affected the imposition of sentence. I agree with Judge Roney that the propriety of the taking of this evidence need not be decided. The district judge made it clear that this testimony was not a controlling factor in his decision, finding the record otherwise demanded the conclusion that no prejudice had resulted. Whether or not the sentencing judge should be permitted to testify should await a case in which the issue is presented. However, I offer these observations.
 
 
 192
 First, if such evidence is to be excluded, that ought not be based upon any notion of lack of reliability. The progress of cases of this sort through the state-federal apparatus is such that years usually pass before there is an occasion for the taking of testimony in a federal habeas court. Therefore, all witnesses before the habeas court are recounting facts, observations, opinions and impressions of years earlier. I know of no characteristic forgetfulness of judges which would make them less reliable than other witnesses called upon to testify to such prior events. The district judge is empowered, and has the ability, to appraise the effect upon credibility of the remoteness in time of the events.
 
 
 193
 Second, I question that there should be a blanket prohibition against the taking of the testimony of a sentencing judge were he to offer to say that, had he been aware of the evidence overlooked by defense counsel, he would not have handed down a death sentence.
 
 
 194
 There are, however, serious institutional implications in permitting the calling of the sentencing authority to the stand in the habeas court. Where that authority is the jury, should jurors be permitted to testify, perhaps to impeach their verdict? If not, is there equal protection if the judge, as sentencing authority, is subject to being called?
 
 
 195
 The issue need not be decided today.
 
 
 196
 With these remarks, I concur in the dissenting opinion of Judge Roney.
 
 
 
 *
 Former Fifth Circuit case, Section 9(1) of Public Law 96-452--October 14, 1980
 
 
 **
 Judge Hatchett did not participate in the consideration or decision of this case
 
 
 [1]
 One of the injured women remained unconscious for over a year before she died
 
 
 [2]
 In its order denying Washington's motion for postconviction relief, the court for the eleventh judicial circuit of Florida characterized Tunkey as "one of the leading criminal defense attorneys in Dade County ...."
 
 
 [3]
 Tunkey anticipated that the state would attempt to use Washington's conviction in connection with the Pridgen murder to furnish an additional aggravating circumstance in the Birk and Meli cases pursuant to section 921.141(5)(b) of the Florida statutes. He successfully moved to prevent use of the Pridgen case in this manner. Tunkey also made a motion for a continuance which was denied by Judge Fuller
 
 
 [4]
 With respect to the affidavits, the court found that "the best that could be said ... is that these individuals could have testified that the Defendant was a basically good person who had not been in trouble with the law on prior occasions and that he was worried about his family because of his financial difficulties at the time of these murders, a fact that was testified to by the defendant himself at the plea colloquy." The court also found that the new psychiatric reports might actually have harmed Washington's case because they conclusively established the absence of the statutory mitigating circumstance of extreme mental or emotional disturbance. The court stated that the course actually pursued by Tunkey, to put on evidence of emotional distress only during the plea colloquy, served Washington's interests by preventing the state from presenting more damaging evidence in cross-examination or rebuttal. The court particularly noted that numerous assertions in the affidavits that Washington had never committed a crime before the ten-day period in September 1976 could have been thoroughly rebutted by the state
 
 
 [5]
 In Knight the Florida Supreme Court drew heavily upon the plurality opinion in United States v. Decoster, 624 F.2d 196 (D.C.Cir.1979) (en banc), in which the court stated:
 [T]he accused must bear the initial burden of demonstrating a likelihood that counsel's inadequacy affected the outcome of the trial.
 Id. at 208.
 
 
 [6]
 The panel opinion inadvertently misquoted the Florida Supreme Court and gave the impression that the supreme court had only affirmed the circuit court's finding that no prejudice resulted from Tunkey's conduct. See Washington v. Strickland, 673 F.2d 879, 884 (5th Cir.1982). In fact the supreme court affirmed the circuit court's decision on both of its stated grounds: that Tunkey's representation was not seriously deficient and that in any case Washington was not prejudiced
 
 
 [7]
 The grounds for relief in addition to the ineffectiveness claim are recounted in the panel opinion. See Washington v. Strickland, 673 F.2d 879, 885-86 n. 3 (5th Cir.1982). One further claim for relief, based upon Gardner v. Florida, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), was raised for the first time at the evidentiary hearing in the district court below. Arguably, therefore, Washington's petition is a "mixed petition" that contains both exhausted and unexhausted claims. Generally, mixed petitions must be dismissed without prejudice while the petitioner pursues his unexhausted claims in state court. Rose v. Lundy, 455 U.S. 509, 510, 102 S.Ct. 1198, 1199, 71 L.Ed.2d 379 (1982); Galtieri v. Wainwright, 582 F.2d 348, 355 (5th Cir.1978) (en banc). There are, however, exceptions to the exhaustion doctrine. Id. at 354. In this case the district court found that Washington's petition came within such an exception, and the State of Florida does not dispute the district court's finding on appeal. Since the exhaustion requirement is a matter of comity rather than a matter of jurisdiction, see Rose v. Lundy, 455 U.S. at 518-20, 102 S.Ct. at 1203-04; Stinson v. Alabama, 585 F.2d 748, 748 (5th Cir.1978), the court of appeals will not dismiss the petition sua sponte in this case. We adopt the conclusion of the panel that the district court properly found that the Gardner claim was without merit. See Washington v. Strickland, 673 F.2d at 889 n. 5
 
 
 [8]
 Opinion of district court at 7
 
 
 [9]
 Id. at 9
 
 
 [10]
 Id. at 16-17. The court also stated that it did not consider the testimony of Judge Fuller to be determinative on the issue of prejudice:
 [R]ecognizing the potential weakness of hindsight analysis, I have not treated Judge Fuller's testimony as determinative on the issue of prejudice. Rather, reviewing the proposed character and psychiatric testimony, and weighing it against the detailed record of petitioner's conduct in initiating and carrying out three separate episodes of planned robbery, kidnapping and murder, there does not appear to be a likelihood, or even a significant possibility that the balancing of aggravating against mitigating circumstances under the Florida death penalty statute would have been altered in petitioner's favor. Critically, the character and medical testimony cannot reasonably be characterized as evidence of extreme mental or emotional disturbance. Nor does it provide persuasive rationalization for petitioner's extended and calculated course of violence. Therefore, it is my determination on the critical legal issue, that petitioner was not prejudiced by the inaction which did occur, and was not denied his Constitutional right to effective assistance of counsel, as that standard is defined under present case law.
 
 
 [11]
 This burden of persuasion can be phrased alternatively as the burden to rebut the presumption of attorney competence. See Michel v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 164, 100 L.Ed. 83 (1955); Cox v. Wyrick, 642 F.2d 222, 226 (8th Cir.), cert. denied, 451 U.S. 1021, 101 S.Ct. 3013, 69 L.Ed.2d 394 (1981); United States v. Garcia, 625 F.2d 162, 170 (7th Cir.), cert. denied, 449 U.S. 923, 101 S.Ct. 325, 66 L.Ed.2d 152 (1980)
 
 
 [12]
 Washington urges us to apply a special set of rules regarding ineffective assistance of counsel to capital cases. The court has rejected similar advice from another petitioner in Washington v. Watkins, 655 F.2d 1346, 1356-57 (5th Cir.1981), cert. denied, --- U.S. ----, 102 S.Ct. 2021, 72 L.Ed.2d 474 (1982), and we do so again here. The relevant inquiry in all cases involving claims of ineffectiveness of counsel, irrespective of the degree of punishment that the state seeks to impose, is whether counsel rendered reasonably effective assistance given the totality of the circumstances. The degree of punishment is but one of the totality of circumstances. See also Gray v. Lucas, 677 F.2d 1086, 1092 (5th Cir.1982)
 Washington also argues that Tunkey's failure to investigate and present character evidence rendered the imposition of the death penalty unconstitutional under Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). In Lockett the Supreme Court struck down a procedure which prevented the sentencer from considering aspects of the defendant's character and record as nonstatutory mitigating factors. Id. at 604, 98 S.Ct. at 2964. As noted by the court in Washington v. Watkins, the Supreme Court cases on the death penalty deal with "procedural flaw[s] in the system of justice," not with alleged flaws in the judgment of counsel. 655 F.2d at 1356. Therefore, Tunkey's failure to investigate or present extensive character evidence does not render the imposition of the death penalty unconstitutional.
 
 
 [13]
 The allegations of the petitioner in Plant are somewhat confusing. The petitioner apparently alleged that his counsel was ineffective for failing to prepare an alibi defense and relying instead on a defense that conceded petitioner's proximity to the crime but alleged nonparticipation. See also cases cited infra note 21
 
 
 [14]
 Since the focus of the analysis in this opinion is the extent of investigation appropriate before proceeding to trial, we do not specifically discuss the duty to investigate before advising a client to plead guilty. See, e.g., McMann v. Richardson, 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970). We do, however, draw upon the reasoning of these cases for certain general principles. See infra note 21
 
 
 [15]
 See also Beavers v. Balkcom, 636 F.2d 114, 116 (5th Cir.1981); Davis v. Alabama, 596 F.2d 1214, 1218 (5th Cir.1979), vacated as moot, 446 U.S. 903, 100 S.Ct. 1827, 64 L.Ed.2d 256 (1980); Wood v. Zahradnick, 578 F.2d 980, 982 (4th Cir.1978); United States v. Moore, 554 F.2d 1086, 1092-93 (D.C.Cir.1976); Brennan v. Blankenship, 472 F.Supp. 149, 155-57 (W.D.Va.1979), aff'd mem., 624 F.2d 1093 (4th Cir.1980). Cf. Michel v. Louisiana, 350 U.S. 91, 105, 76 S.Ct. 158, 166, 100 L.Ed. 83 (1955) (Douglas, J., dissenting) (where state procedure deprived counsel of opportunity to raise one dispositive issue, defendant was denied his constitutional rights)
 
 
 [16]
 The scope of duty to conduct an investigation into defendant's one line of defense may be affected, however, by factors such as the strength of the government's case. See, e.g., United States v. Katz, 425 F.2d 928, 930 (2d Cir.1970). Also, strategy may play a role when counsel reasonably determines that interviewing a certain witness or obtaining a certain report may prove to be more harmful to the defendant's case than it is helpful. See, e.g., Easter v. Estelle, 609 F.2d 756, 759 (5th Cir.1980) (strategic choice not to open the door to prior crime evidence excuses failure to interview certain witnesses)
 
 
 [17]
 In this case, for instance, Tunkey testified to the effect that he saw two plausible lines of defense: one based upon emotional distress and the other based upon expressions of sincerity calculated to play upon the judge's known inclination to view such expressions with favor. According to his testimony, he presented a limited version of the first line at the plea colloquy and a full version of the second line at the sentencing hearing
 
 
 [18]
 Apart from this reluctance to interfere with the adversary process, there are concrete and sensible reasons why courts will almost invariably defer to the fully informed strategic choice of counsel. No two attorneys will present an identical defense, even if they are equipped with perfect knowledge. Advocacy is the art of persuasion; it is not a science. A court in a habeas corpus proceeding, several stages removed from the heat of battle, is seldom able to determine whether the strategic choices made by counsel were the right ones. See United States v. Bosch, 584 F.2d 1113, 1121 (1st Cir.1978). See also Wiley v. Sowders, 647 F.2d 642, 648 (6th Cir.), cert. denied, 454 U.S. 1091, 102 S.Ct. 656, 70 L.Ed.2d 630 (1981); United States v. Thomann, 609 F.2d 560, 566 (1st Cir.1979); United States v. Katz, 425 F.2d 928, 930-31 (2d Cir.1970)
 
 
 [19]
 We assume here, without deciding, that conferring with one's client and reviewing the state's case constitute the bare minimum amount of investigation that counsel must conduct before he forms his trial strategy
 
 
 [20]
 Just as the case law contains apparently contradictory statements regarding trial strategy, see supra at 1251, so it contains differing statements regarding the legitimate role of assumptions in the course of representation. In Powell v. Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932), two attorneys were appointed to represent the defendants on the morning of trial. The Court found that they were thereby denied assistance of counsel:
 It is not enough to assume that counsel thus precipitated into the case thought there was no defense, and exercised their best judgment in proceeding to trial without preparation .... No attempt was made to investigate. No opportunity to do so was given.
 Id. at 58, 53 S.Ct. at 60. See also United States v. Moore, 554 F.2d 1086, 1092-93 (D.C.Cir.1976) (footnote omitted) (counsel's failure to interview witnesses because of their expected response "does not excuse the failure to find out; speculation cannot substitute for certainty").
 Clearly, an attorney cannot excuse his total failure to investigate simply because he assumes that there is no way to defend his client. However, when an attorney is in the process of choosing the lines of defense on which he will concentrate his investigative effort, he will often have to use his professional judgment to form assumptions regarding the prospects for success from a certain line of defense. See Gray v. Lucas, 677 F.2d 1086, 1093 & n. 4 (5th Cir.1982) (assumptions regarding the best evidence likely to be derived from interviewing certain character witnesses justified strategic choice not to pursue that investigation); Plant v. Wyrick, 636 F.2d 188, 189-90 (8th Cir.1980) (decision not to pursue a certain line of inquiry was arrived at by "an experienced criminal attorney exercising his professional judgment"). See also cases cited infra note 21.
 
 
 [21]
 See, e.g., Jones v. Kemp, 678 F.2d 929, 931-32 (11th Cir.1982) (strategic choice to investigate line of defense based upon lack of possession excuses failure to investigate defense based upon absence of knowledge); Wilkerson v. United States, 591 F.2d 1046, 1047 (5th Cir.1979) (strategic choice to concentrate upon legal challenges where government's evidence was overwhelming excuses failure to perform "fruitless legwork"); Gray v. Lucas, 677 F.2d 1086, 1093-94 (5th Cir.1982) (strategic choice to investigate psychiatric evidence at the expense of character evidence was justified by reasonable assumptions regarding probabilities of success); Plant v. Wyrick, 636 F.2d 188, 189-90 (8th Cir.1980) (failure to interview certain witnesses was a matter of professional judgment where counsel pursued the only defense that offered a significant possibility of success); Gustave v. United States, 627 F.2d 901, 906 (9th Cir.1980) (strategic choice regarding proper allocation of time excuses failure to inquire into racial bias of jury during voir dire); Reynolds v. Mabry, 574 F.2d 978, 981 (8th Cir.1978) (strategic choice to rely upon insanity defense excuses failure to investigate defenses relating to circumstances of arrest); United States v. Ladley, 517 F.2d 1190, 1194 (9th Cir.1975) (strategic choice not to pursue certain lines of investigation excused where counsel presented forceful defense); United States v. Hearst, 466 F.Supp. 1068, 1087 (N.D.Cal.1978) (failure to investigate effects of pretrial publicity excused by strategic choice to conduct trial in San Francisco), aff'd in part, vacated in part, 638 F.2d 1190, 1195-96 (9th Cir.1980) (failure by attorney to investigate substantially possibility that hallucinogens affected defendant's behavior excused where on the basis of trial strategy "he devoted his energies to other aspects of [the] defense"), cert. denied, 451 U.S. 938, 101 S.Ct. 2018, 68 L.Ed.2d 325 (1981). Cf. McMann v. Richardson, 397 U.S. 759, 769-70, 90 S.Ct. 1441, 1448-49, 25 L.Ed.2d 763 (1970) (in advising client whether to plead guilty, counsel necessarily relies upon his "best judgment" of possible defenses and the strength of the state's case); Bradbury v. Wainwright, 658 F.2d 1083, 1087-88 (5th Cir.1981) (failure to investigate fully insanity defense before advising client to plead guilty is not ineffective assistance where partial investigation led attorney to reasonable conclusion that the defense had little chance to succeed); Jackson v. Estelle, 548 F.2d 617, 618 (5th Cir.1977) (same conclusion); Benson v. United States, 552 F.2d 223, 225 (8th Cir.) (failure to make independent investigation of facts before advising client to plead guilty is not ineffective assistance when the case against defendant was overwhelming), cert. denied, 434 U.S. 851, 98 S.Ct. 164, 54 L.Ed.2d 120 (1977)
 
 
 [22]
 See, e.g., Young v. Zant, 677 F.2d 792, 798-800 (11th Cir.1982); Kemp v. Leggett, 635 F.2d 453, 454-55 (5th Cir.1981); Brubaker v. Dickson, 310 F.2d 30, 38-39 (9th Cir.1962), cert. denied, 372 U.S. 978, 83 S.Ct. 1110, 10 L.Ed.2d 143 (1963)
 
 
 [23]
 The determination whether strategic choices based upon a set of assumptions are reasonable is a question of fact for the district courts. We suggest only a few factors to inform that determination. First, the experience of the attorney is relevant. An attorney who has handled numerous cases in the criminal field will have formed a more accurate picture of which lines of defense are most likely to succeed. Compare Kemp v. Leggett, 635 F.2d 453, 454 (5th Cir.1981) (attorney with little previous experience fails to interview witnesses and adopts a line of defense "not the most compatible with the facts") with Washington v. Watkins, 655 F.2d 1346, 1364 & n. 36 (5th Cir.1981) (attorney who had observed the tactics of other lawyers in comparable cases reasonably chose not to investigate racial composition of jury venire). Second, when the line of defense actually pursued by counsel was inconsistent with the line that was not pursued, counsel's strategic choice to investigate one rather than the other is more likely to be reasonable. When the lines of defense are consistent so that both could be presented at trial, there may be a less compelling reason not to have pursued both prior to trial. Compare Jones v. Kemp, 678 F.2d 929, 931-32 (11th Cir.1982) (strategic choice not to investigate one line of defense is acceptable when presentation of that line at trial would have contradicted defendant's testimony) and Gray v. Lucas, 677 F.2d 1086, 1094 (5th Cir.1982) (strategic choice not to investigate fully one line of defense justified when lawyers could reasonably determine that a jury would find it inconsistent with line actually presented at trial) with In re Saunders, 2 Cal.3d 1033, 88 Cal.Rptr. 633, 472 P.2d 921 (1970) (strategic choice not to investigate diminished capacity defense was unreasonable when that defense was stronger than and consistent with the defense actually pursued). Finally, the degree of possible prejudice that might foreseeably result from the strategic choice is a relevant factor. See Cooper v. Fitzharris, 586 F.2d 1325, 1330 n. 10 (9th Cir.1978) (en banc), cert. denied, 440 U.S. 974, 99 S.Ct. 1542, 59 L.Ed.2d 793 (1979). Thus, a choice that was "likely to result in prejudice which was foreseeably less severe than that resulting from the chosen course" might be more reasonable than the chosen course. Id
 The listed factors are neither exhaustive nor individually determinative in the reasonableness inquiry. Cf. Washington v. Watkins, 655 F.2d at 1364 & n. 36 (strategic choice not to investigate racial composition of grand jury venire was reasonable even though that line of defense was not inconsistent with line presented at trial).
 
 
 [24]
 A finding by the district court as to whether a choice was strategic is a finding of fact that will be accepted by the court of appeals unless clearly erroneous. Beckham v. Wainwright, 639 F.2d 262, 265-66 (5th Cir.1981). See also Pullman-Standard v. Swint, 456 U.S. ----, ----, 102 S.Ct. 1781, 1789-91, 72 L.Ed.2d 66 (1982); United States v. Cruz, 581 F.2d 535, 540-41 (5th Cir.1978) (en banc)
 
 
 [25]
 In Frady Justice O'Connor employed that test to determine whether the petitioner had established prejudice within the meaning of the "cause and prejudice" formulation of Wainwright v. Sykes, 433 U.S. 72, 87, 97 S.Ct. 2497, 2506, 53 L.Ed.2d 594 (1977). For reasons discussed infra, we decide that this formulation of the petitioner's burden is an equitable allocation of the burden of proof between the petitioner and the state in cases of ineffective assistance of counsel
 
 
 [26]
 There may be cases in which the ineffectiveness of counsel is so pervasive that a particularized inquiry into prejudice would be "unguided speculation." See, e.g., United States v. Porterfield, 624 F.2d 122, 125 (10th Cir.1980). This is certainly not such a case
 
 
 [27]
 It is not difficult to imagine the absurd and unjust results of a rule of automatic reversal. In United States v. Winston, 613 F.2d 221 (9th Cir.1980), the court found that petitioner's trial counsel was arguably ineffective because of his failure to obtain a psychiatric report. The petitioner had been acquitted, however, on the one count to which the report was relevant. The court found, therefore, that petitioner had not been prejudiced by counsel's ineffectiveness, and refused to grant the writ. Id. at 223. Washington's proposed rule would require granting the writ in that situation
 
 
 [28]
 See also McQueen v. Swenson, 498 F.2d 207, 219 (8th Cir.1974). Indeed, even when the state shares responsibility for interfering with the effectiveness of petitioner's counsel or with the presentation of his case, the courts will often require an inquiry into whether prejudice resulted. See, e.g., United States v. Valenzuela-Bernal, 458 U.S. ----, ----, 102 S.Ct. 3440, 3449-50, 73 L.Ed.2d 1193 (1982); Hopper v. Evans, 456 U.S. ----, ---- & n. *, 102 S.Ct. 2049, 2054 & n. *, 72 L.Ed.2d 367 (1982); United States v. Morrison, 449 U.S. 361, 364-66 & n. 2, 101 S.Ct. 665, 667-69 & n. 2, 66 L.Ed.2d 564 (1981)
 
 
 [29]
 At least one judge has suggested that Chapman itself requires some showing of prejudice by the defendant before the burden of showing harmlessness beyond a reasonable doubt shifts to the state. See United States v. Decoster, 624 F.2d 196, 237 (D.C.Cir.1979) (en banc) (MacKinnon, J., concurring)
 The Supreme Court has in some instances required a positive showing of prejudice by a defendant before it will grant relief for an alleged violation of a constitutional right. See, e.g., United States v. Valenzuela-Bernal, 458 U.S. ----, ----, 102 S.Ct. 3440, 3446, 73 L.Ed.2d 1193 (1982) (compulsory process clause); United States v. Agurs, 427 U.S. 97, 104, 96 S.Ct. 2392, 2397-98, 49 L.Ed.2d 342 (1976) (due process clause); see Coles v. Peyton, 389 F.2d 224, 230 (4th Cir.) (Craven, J., dissenting) (discussing Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965)), cert. denied, 393 U.S. 849, 89 S.Ct. 80, 21 L.Ed.2d 120 (1968). Cf. Chambers v. Maroney, 399 U.S. 42, 54, 90 S.Ct. 1975, 1982, 26 L.Ed.2d 419 (1970) (alleged violation of right to effective assistance of counsel denied where "the claim of prejudice ... was without substantial basis").
 
 
 [30]
 If this court were to offer a significantly more favorable procedural posture to claims of ineffective assistance than to other habeas claims, we would establish a perverse incentive to present alleged trial errors as ineffective assistance claims. This incentive would tend to undermine the "cause and prejudice" requirement in Wainwright and Frady, see Tague, Federal Habeas Corpus and Ineffective Representation of Counsel: The Supreme Court Has Work To Do, 31 Stan.L.Rev. 1, 63-64 (1978); Strazzella, Ineffective Assistance of Counsel Claims: New Uses, New Problems, 19 Ariz.L.Rev. 443, 479 (1977), and encourage the filing of frivolous ineffectiveness claims in an attempt to obtain enhanced procedural advantages. See Cooper v. Fitzharris, 586 F.2d 1325, 1329-30 (9th Cir.1978) (en banc), cert. denied, 440 U.S. 974, 99 S.Ct. 1542, 59 L.Ed.2d 793 (1979)
 The case law has generally recognized a rough congruence between the showing of prejudice necessary to avoid procedural default under Wainwright and the showing of prejudice necessary to obtain a new trial for ineffective assistance of counsel. See, e.g., Jurek v. Estelle, 593 F.2d 672, 680-84 (5th Cir.), vacated, 597 F.2d 590 (5th Cir.1979), rehearing en banc, 623 F.2d 929 (5th Cir.1980) (issue of interplay between Wainwright and substantive prejudice requirement not reached), cert. denied, 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1981); Canary v. Bland, 583 F.2d 887, 890 (6th Cir.1978). See also Wainwright v. Sykes, 433 U.S. 72, 98, 97 S.Ct. 2497, 2512, 53 L.Ed.2d 594 (1977) (White, J., concurring).
 
 
 [31]
 If in a given case the petitioner does not have access to the information necessary to sustain his burden of proof, the district court is of course free to make appropriate adjustments in the allocation of the burden. See, e.g., United States ex rel. Green v. Rundle, 434 F.2d 1112, 1115 (3d Cir.1970)
 
 
 [32]
 See supra note 25 regarding the general congruence between the showing of prejudice to avoid procedural default and the showing necessary to obtain a new trial for violation of the right to effective assistance of counsel. See also The Supreme Court, 1976 Term, 91 Harv.L.Rev. 70, 219-21 (1977)
 
 
 [33]
 Our acceptance of the rule that the ineffective counsel question and the prejudice question are distinct inquiries, Washington v. Watkins, 655 F.2d at 1359 n. 23, may seem to imply that there is a bright line between the two. We recognize, however, that such is not always the case. Claimed errors of omission or commission arise in a wide variety of circumstances sometimes resulting in substantial imbrication
 On occasion it may be perfectly clear that an omitted act or a potential line of inquiry would not have benefited the defendant. The evinced absence of prejudice then mitigates the need for inquiry into the effectiveness of counsel. (Indeed, manifest absence of benefit to defendant may have been the reason for its abandonment by effective counsel). We do not suggest that when it is apparent that no prejudice resulted from a claimed act or omission, and a habeas court so finds, that it commits reversible error by failing to record specific findings with respect to the effectiveness inquiry. We also do not suggest that under all circumstances the stated order of consideration of the two issues will be the more orderly or logical.
 As we have determined above, however, constitutional deprivation of the assistance of counsel is not shown until prejudice also is shown, when as here the claimed ineffectiveness consists of counsel's errors of omission or commission.
 In addition to being analytically sound, separate and distinct findings on the two issues provide a practical advantage during the apparently inevitable appeal. In many cases they may avoid the necessity of a remand for further findings.
 
 
 [34]
 As noted above, the petitioner raised fourteen legal challenges to the death sentence in addition to his ineffectiveness claim. We have already affirmed the district court's disposition of one of those claims. See supra note 7. The remaining thirteen challenges were dismissed by the district court without elaboration because, in its view, "independent review of these issues reveals them to be meritless."
 The panel opinion correctly stated that it is the preferred practice for the district courts to include a brief explanation of its disposition of each individual claim. This practice is not mandatory, however, when the court "reject[s] claims which it regards as frivolous or totally without merit." Sumner v. Mata, 449 U.S. 539, 548, 101 S.Ct. 764, 770, 66 L.Ed.2d 722 (1981). The district court found the remaining thirteen grounds to be devoid of merit, and our review of those grounds persuades us that the district court could appropriately reject those grounds without elaboration. We therefore affirm the dismissal of the remaining thirteen grounds.
 Additionally, the state cross-appealed the district court's refusal to dismiss Washington's petition as untimely and therefore as an abuse of the writ. We affirm the district court's decision. See Jackson v. Estelle, 570 F.2d 546, 547 (5th Cir.1978).
 
 
 [1]
 I note immediately that because the issue of prejudice arising from counsel's failure to produce evidence at a state capital-sentencing trial must be determined within the context of the state's death penalty scheme, my discussion of prejudice in this opinion may pertain only to death sentences imposed under Florida law
 
 
 [2]
 For a fuller account of these crimes, see Washington v. State, 362 So.2d 658, 660-61 (Fla.1978)
 
 
 [3]
 I note that Tunkey's general competence as a lawyer, or the quality of his representation at any point until the sentencing phase of the trial, is not at issue here
 
 
 [4]
 The judge also sentenced Washington to consecutive terms of imprisonment for the other offenses involved
 
 
 [5]
 Both aggravating and mitigating circumstances fall into two categories: those that aggravate, Fla.Stat. Sec. 921.141(5)(c-i), or mitigate, id. Sec. 921.141(6)(c-e), the offense, and those that aggravate, id. Sec. 921.141(5)(a) & (b), or mitigate, id. Sec. 921.141(6)(a), (b), (f), & (g), the offender
 
 
 [6]
 An earlier Fla.R.Crim.P. 3.850 motion was denied October 2, 1980, without prejudice to refile, due to a lack of verification. Clemency proceedings ensued, but Governor Graham signed petitioner's death warrant on March 13, 1981, setting execution for the week April 6-10. Washington then refiled his rule 3.850 motion, appropriately verified
 
 
 [7]
 Thus, petitioner argued neither that his "new" sentencing profile required a sentence of life imprisonment as a matter of state sentencing policy nor that it did as a matter of federal constitutional law. For a discussion of the crucial difference between the two, see note 21 infra
 
 
 [8]
 For a more extensive discussion of these affidavits, see Washington v. Strickland, 673 F.2d at 888 n. 4
 
 
 [9]
 The state's claim that the Florida state court's rejection of the ineffective assistance claim is entitled to 28 U.S.C. Sec. 2254(d)'s (1976) presumption of validity requires no extensive discussion. Ineffective assistance claims are mixed questions of law and fact, and section 2254(d) is therefore wholly inapplicable. Baty v. Balkcom, 661 F.2d 391, 394 n. 5 (5th Cir.1981), cert. denied, --- U.S. ----, 102 S.Ct. 2307, 73 L.Ed.2d 1308 (1982); Harris v. Oliver, 645 F.2d 327, 330 n. 3 (5th Cir.), cert. denied, 454 U.S. 1109, 102 S.Ct. 687, 70 L.Ed.2d 650 (1981); Mason v. Balcom, 531 F.2d 717, 721-22 (5th Cir.1976)
 Moreover, the absence of an evidentiary hearing in state court on this claim disposes of the state's contention. The presumption referred to, 28 U.S.C. Sec. 2254(d) (1976), applies only to
 determination(s) after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer ... thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia ....
 The Florida court disposed of this claim on the pleadings for failure to state a claim on which relief could be granted; therefore, section 2254(d)'s presumption is irrelevant.
 
 
 [10]
 The state collateral attack court applied the standards the Florida Supreme Court enunciated in Knight v. State, 394 So.2d 997 (Fla.1981), to analyze the prejudice issue. Knight v. State, in turn, relied heavily on a plurality opinion of the Court of Appeals for the District of Columbia Circuit. See United States v. Decoster, 624 F.2d 196, 208 (D.C.Cir.1979) (en banc) (opinion of Leventhal, J., for four members of the court). The "outcome determinative" test set forth in Decoster may not now command a majority of the Court of Appeals for the District of Columbia Circuit, and it does not command a majority of this court. See note 18 infra
 I do not mean to criticize, however, the Florida Supreme Court for adopting the outcome-determinative test. As I discuss in Parts II & III infra, there are reasons why a federal court should not adopt such a test that do not apply to the state courts. In particular, state collateral attack courts may promulgate state sentencing policy, but federal courts have no power to do so. Because the outcome-determinative test requires federal courts to make provisional state sentencing policy, we must reject it. Nevertheless, the state is free to adopt any test for prejudice it chooses, subject to federal constitutional limitations. No claim is made in this case that the Florida courts may not constitutionally adopt an outcome-determinative test to determine whether a lawyer's failure to introduce mitigating evidence at the sentencing hearing prejudiced his client, and I intimate no opinion thereon.
 
 
 [11]
 This is the crucial information required to determine the relevance of 28 U.S.C. Sec. 2254(d) and the need for an evidentiary hearing. See note 9 supra
 
 
 [12]
 The foundation for the hearing, as in all habeas cases, was the record of the sentencing and collateral attack proceedings in the Dade County Circuit Court, and the two opinions of the Florida Supreme Court reviewing those proceedings, together with copies of petitioner's briefs. See Federal Habeas Rules 2, 4, and 5
 
 
 [13]
 My resolution of the prejudice issue makes it unnecessary for me to decide the question of incompetence. I intimate no opinion thereon
 
 
 [14]
 When a district court presented with a sixth amendment claim such as the one in this case elects to rule on a Fed.R.Civ.P. 41(b) motion at the close of the petitioner's case, it must decide: (1) whether petitioner has produced mitigating evidence that would have caused the sentencing court to reconsider its decision, see Part II infra; and (2) whether the evidence indicates that lawyer incompetence--that is, ineffectiveness of constitutional magnitude--was the cause of the omission of this evidence at sentencing rather than, for example, a competent strategic choice. Both issues present mixed questions of law and fact. In answering these questions at the close of petitioner's case, the district court of course does not make credibility choices, weigh the evidence, and decide facts; it only determines whether the petitioner has established a prima facie case
 
 
 [15]
 The court also summarily rejected fourteen additional alleged deficiencies in the state proceedings and the Florida sentencing statute, noting that although the issues had not been fully briefed, "my independent review of these [claims] reveals them to be meritless." Record, vol. I, at 20. The district court did not explain why these additional claims were meritless; consequently, the panel was unable to carry out its appellate review function. The panel directed the district court, on remand, to address and dispose of each claim separately. Washington v. Strickland, 673 F.2d at 907. I concur in the panel's instruction to the district court
 
 
 [16]
 Although the Watkins court made that observation, it had no reason to clarify the law because in that case petitioner failed to demonstrate any prejudice whatsoever. 655 F.2d at 1362-63
 
 
 [17]
 Accord Beavers v. Balkcom, 636 F.2d 114, 116 (5th Cir.1981); Mendiola v. Estelle, 635 F.2d 487, 491 (5th Cir.1981); Lovett v. Florida, 627 F.2d 706, 709-10 (5th Cir.1980); Davis v. Alabama, 596 F.2d 1214, 1221 (5th Cir.), vacated as moot, 446 U.S. 903, 100 S.Ct. 1827, 64 L.Ed.2d 256 (1979), vacated on remand, 623 F.2d 366 (5th Cir.1980); Buckelew v. United States, 575 F.2d 515, 521 (5th Cir.1978); United States v. Doran, 564 F.2d 1176, 1177-78 (5th Cir.1977), cert. denied, 435 U.S. 928, 98 S.Ct. 1498, 55 L.Ed.2d 524 (1978); see United States v. Morrison, 449 U.S. 361, 364, 101 S.Ct. 665, 668, 66 L.Ed.2d 564 (1981):
 The premise of our prior cases is that the constitutional infringement identified has had or threatens some adverse effect upon the effectiveness of counsel's representation or has produced some other prejudice to the defense. Absent such impact on the criminal proceeding, however, there is no basis for imposing a remedy in that proceeding, which can go forward with full recognition of the defendant's right to counsel and to a fair trial.
 But cf. Holloway v. Arkansas, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978) (when court improperly requires the same attorney to represent two defendants with conflicting interests at same trial, reversal is automatic without a showing of prejudice); Geders v. United States, 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976) (when trial court prohibits defendant from consulting his attorney during overnight recess separating his direct testimony from his cross-examination, reversal is automatic); Herring v. New York, 422 U.S. 853, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975) (refusal to permit counsel to make a closing argument is a denial of effective assistance of counsel, and no showing of prejudice is required).
 
 
 [18]
 It is significant to note that the outcome-determinative test advocated by the plurality in Decoster v. United States, 624 F.2d at 208, was developed to assess the effectiveness of counsel in the guilt phase of an armed robbery trial. I have found no case, other than the one before us, in which a federal court applied the outcome-determinative test to the sentencing phase of a capital trial. Furthermore, the plurality opinion in Decoster may not even be the controlling standard in the District of Columbia Circuit today. See United States v. Wood, 628 F.2d 554, 559 (D.C.Cir.1980) (en banc; per curiam) ("In order to secure a reversal, appellant must establish some basis for believing that a different kind of preparation would have resulted in the presentation of a contrary line of testimony for the jury's consideration"). Subsequent panel opinions fail to resolve the question precisely. Compare United States v. Hinton, 631 F.2d 769, 782 (D.C.Cir.1980) ("likely prejudice" required) with United States v. Patterson, 652 F.2d 1046, 1048 (D.C.Cir.), cert. denied, 454 U.S. 904, 102 S.Ct. 412, 70 L.Ed.2d 223 (1981) (suggesting an "outcome determinative" test might be controlling)
 
 
 [19]
 Cf. Holloway v. Arkansas, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978):
 In the normal case where a harmless-error rule is applied, the error occurs at trial and its scope is readily identifiable.... But in a case of joint representation of conflicting interests the evil--it bears repeating--is in what the advocate finds himself compelled to refrain from doing .... It may be possible in some cases to identify from the record the prejudice resulting from an attorney's failure to undertake certain trial tasks, but even with a record of the sentencing hearing available it would be difficult to judge intelligently the impact of a conflict on the attorney's representation of a client.... Thus, an inquiry into a claim of harmless error here would require, unlike most cases, unguided speculation."
 435 U.S. at 490-91, 98 S.Ct. at 1182 (first emphasis in the original, second emphasis added; citations omitted).
 
 
 [20]
 When I refer to the sentencer I mean the sentencing circuit judge, but I note that he takes into account the recommendation of the advisory jury. Fla.Stat. Sec. 921.141(2)
 
 
 [21]
 I must emphasize that although state courts are the primary promulgators of state sentencing policy, they are, of course, subject to the Federal Constitution. Federal courts are the ultimate interpreters of that venerable document. Therefore, if a claim is made that a state sentencing decision is unconstitutional, because, for example, it is arbitrarily disparate from other sentences, the federal courts must decide that claim. Petitioner raises no such claim in this case, and I intimate no opinion thereon
 In this case, petitioner claims only that he was prejudiced as a matter of state law because he may have received a life sentence had his counsel produced the omitted mitigating evidence at his sentencing hearing. Although petitioner's incompetency claim is based on the sixth and fourteenth amendments to the Federal Constitution, he attempts to show prejudice only as a matter of state law. Because we are dealing with a claim one aspect of which, incompetency, is based on federal law, and the other aspect, prejudice, on state law, unfortunately we may have to concern ourselves with state sentencing policy somewhat. Aside from this intrusion, which, as I discuss in Part III infra, is within the state's power to prevent, we as federal courts have no business involving ourselves with state sentencing policy unless, of course, a constitutional claim arises.
 
 
 [22]
 The use of the outcome-determinative test creates a situation analogous to the situation the Supreme Court sought to avoid by fashioning the abstention doctrine in Railroad Commission v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941):
 In this [case] a federal court of equity is asked to decide an issue by making a tentative answer which may be displaced tomorrow by a state adjudication.... The reign of law is hardly promoted if an unnecessary ruling of a federal court is thus supplanted by a controlling decision of a state court. The resources of equity are equal to an adjustment that will avoid the waste of a tentative decision ....
 312 U.S. at 500, 61 S.Ct. at 645 (citations omitted).
 
 
 [23]
 The petitioner must carry his burden of proof by a preponderance of the evidence. See Walker v. Johnston, 312 U.S. 275, 286, 61 S.Ct. 574, 579, 85 L.Ed. 830 (1941) (a habeas case in which the Supreme Court required petitioner to bear "the burden of sustaining his allegations by a preponderance of the evidence"). This traditional civil burden of proof and its allocation are used because habeas corpus proceedings are civil proceedings. See Browder v. Director, Department of Corrections, 434 U.S. 257, 269, 98 S.Ct. 556, 563, 54 L.Ed.2d 521 (1978) ("It is well settled that habeas corpus is a civil proceeding")
 Judge Vance disagrees with this traditional burden and its allocation as applied in this case. He would change the model in habeas corpus cases based on an ineffective assistance of counsel claim to the following: the petitioner bears the burden of proving by a preponderance of the evidence that the ineffective assistance of counsel worked to his actual and substantial disadvantage. If petitioner satisfies this initial burden, then the burden of proof shifts to the state who must prove that counsel's ineffectiveness was harmless beyond a reasonable doubt.
 I reject Judge Vance's proposed burden and its allocation for several reasons. First, Judge Vance's proposal clearly flies in the face of the traditional standards of proof used in civil proceedings. In addition, Judge Vance's proposed burden and its allocation are totally inconsistent--if either the petitioner or the state satisfies their respective burdens, then the other party cannot, as a matter of law, satisfy its burden. For example, if at the conclusion of the habeas proceeding, the petitioner has carried his burden of proving prejudice (i.e., that the ineffective assistance of counsel worked to his actual and substantial disadvantage), then it is logically impossible also to find that this prejudice was harmless beyond a reasonable doubt. Similarly, if the court finds that petitioner's alleged prejudice was harmless beyond a reasonable doubt, then it cannot also find that petitioner proved this prejudice by a preponderance of the evidence.
 I also reject Judge Vance's proposed allocation of the burden of proof for strong policy reasons. Generally, the burden of proof is allocated to that party who has control of the evidence required to prove the claim raised in the action. In an action based on a claim of ineffective assistance of counsel due to a failure to produce evidence, this mitigating evidence is peculiarly within the control of the petitioner. Therefore, it is appropriate in such cases to allocate the burden of proof to the petitioner.
 Finally, I note that Judge Vance's reliance on Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), to shift the allocation of the burden of proof is misplaced. Chapman arose from a direct appeal of a decision by the California Supreme Court. This case arises from a collateral attack of a sentence of death by a state trial court. The different proceedings require different burdens as well as different allocations of proof. See United States v. Frady, 456 U.S. 152, 165, 102 S.Ct. 1584, 1593, 71 L.Ed.2d 816 (1982) (differences between collateral attack and direct review require differing standards of review); cf. Henderson v. Kibbe, 431 U.S. 145, 154, 97 S.Ct. 1730, 1736-37, 52 L.Ed.2d 203 (1977) (burden of proving that an erroneous instruction was prejudicial greater on collateral attack than on direct review). Thus, Judge Vance is wrong when he suggests that federal district courts in their trial of habeas corpus cases should use the standards the Supreme Court uses in its appellate review.
 
 
 [24]
 As I discuss supra in Part I, in making its findings of fact and conclusions of law the sentencer classifies the offense and the offender in terms of the statutory aggravating and the statutory and nonstatutory mitigating circumstances. It then combines these characteristics into a sentencing profile that presents a comprehensive picture of all aspects relevant to the sentence
 
 
 [25]
 I note that the state collateral attack court promulgates state sentencing policy no matter what test for prejudice it uses in engaging in the third step. For example, if the state court uses an outcome-determinative test, and finds no prejudice, it determines that state policy is such that the new evidence would not have affected the outcome of the sentencer's decision. Therefore, state policy dictates the death sentence. If the state court uses a test such as the one I propose, and finds no prejudice, it determines that state policy is such that the new evidence would not even have materially affected the decision-making process of a rational sentencer. Again, state policy dictates the death sentence. In either case, the state collateral attack court has clearly articulated state sentencing policy, and that is all the federal court is looking for. Therefore, it makes no difference to the federal court for purposes of determining state policy which prejudice test the state court uses. As I discuss at note 10 supra, no constitutional attack is made on the state's test for prejudice and I intimate no opinion thereon
 I note parenthetically one possible scenario, however, in which the state court's test for prejudice may affect the third step of the federal court's process. This situation would occur when the state court finds prejudice under a test more nebulous than the federal test, such as the panel's "altering the trial" standard, but finds no ineffectiveness. Thus, the state court would deny the claim. Again, assuming the federal test for prejudice is clearer than the state court's test, the state court's promulgation of state policy might be unclear to the federal court. If the federal court is true to its test, it must question the state court's finding of prejudice, and this involves a sensitive canvass of state sentencing policy. I note that this problem does not arise strictly from the state court test itself, but rather from the possible unclear articulation of state policy resulting from the state court's use of the test. I raise this scenario parenthetically, but I note that it involves the unlikely confluence of three factors: a state court finding of prejudice, a state court finding of no ineffectiveness, and a state test for prejudice more nebulous than the federal test.
 
 
 [26]
 See also the situation discussed in the second paragraph of note 25 supra
 
 
 [27]
 I note that a fourth possible scenario exists. The petitioner, in alleging prejudice, presents the same sentencing profile to the federal court as he did to the state collateral attack court, which held that petitioner proved prejudice but did not prove ineffective assistance of counsel. I do not discuss this scenario in the text because it is identical to the first scenario in that the state collateral attack court's finding of prejudice is binding on the federal court. The federal court need concern itself only with the incompetency aspect of the claim
 
 
 [28]
 I note that the state, as party to the habeas petition, can do its part by raising petitioner's failure to exhaust his claim to the federal court
 
 
 [29]
 State sentencing courts can also do their part by ensuring that all relevant sentencing evidence is before them before they impose sentence. The state sentencing court can ensure this by performing two simple tasks. First, after receiving the advisory jury's recommended sentence but before convening the parties for sentencing, it can request a presentence investigation report. This will enable the court to impose sentence with considerable knowledge of the crime and the defendant's background. Second, the sentencing court, prior to imposing sentence, can ask both the defendant and his counsel whether any investigation of the defendant's background remains to be done, and whether there is additional relevant information in mitigation of the death penalty that might be presented to the court
 This discussion is not meant to suggest, however, that the sentencing court bears the primary responsibility for ensuring that all relevant sentencing evidence is before it prior to imposing sentence. In an adversary sentencing hearing, this responsibility remains with defense counsel who should look for guidance to the American Bar Association Standards for Criminal Justice. More specifically, defense counsel should consider American Bar Association Standard for Criminal Justice 18-6.3(f)(ii) (2d ed. 1980), which provides that counsel
 should take particular care to make certain that the record of the sentencing proceedings will accurately reflect all relevant mitigating circumstances relating either to the offense or to the characteristics of the defendant which were not disclosed during the guilt phase of the case and to ensure that such record will be adequately preserved ....
 
 
 [30]
 In a typical federal habeas corpus proceeding, a state prisoner begins the procedure by filing a petition pursuant to Federal Habeas Rules 2 and 3. The district court must examine this petition and any attached exhibits to determine whether it states a claim for relief. Federal Habeas Rule 4. If the facts as pled do not state a claim for relief, the court must sua sponte dismiss the petition. Id.; 28 U.S.C. Sec. 2243 (1976). If the facts as pled do state a claim for relief, the court should then examine whether dismissal is appropriate on procedural grounds, e.g., failure to exhaust state remedies, a decision pending in state court, petitioner not in custody within meaning of 28 U.S.C. Sec. 2254 (1976), etc. If dismissal is appropriate on procedural grounds, the court must request the state to move for dismissal on such grounds. See Advisory Committee Note to Federal Habeas Rule 4
 If the facts as pled do state a claim for relief and dismissal is not appropriate on procedural grounds, the court must order the state to file an answer. Federal Habeas Rule 5. In its answer, the state must rebut petitioner's allegations, indicate whether state remedies have been exhausted, and append relevant portions of the transcripts of the state proceedings. Id. With the petition, answer, and supporting documents before it, the district court must redetermine whether a claim for relief is stated. If the court now determines that a claim for relief is not stated, it must sua sponte dismiss the petition. If the court determines that a claim for relief is stated, it then must determine, pursuant to 28 U.S.C. Sec. 2254(d), which factual issues, if any, raised by the petition require an evidentiary hearing. Therefore, when a district court orders an evidentiary hearing in a habeas case, it implicitly holds that from its examination of the pleadings and exhibits before it, petitioner has stated a claim for relief and only factual issues need be resolved.
 The district court did not adhere to this procedure in the instant case because of time constraints. As I discuss in Part I supra, petitioner filed his habeas petition in the district court on April 6, 1981, just two days prior to his scheduled execution. The district court, therefore, was unable initially to examine the petition to determine (1) if it stated a claim for relief, (2) if it should be dismissed on procedural grounds, (3) if the state should file an answer, and (4) if an evidentiary hearing should be held. Instead, the court had to combine these functions in an expedited conference of counsel held on April 7, 1981. There, counsel argued whether the petition stated a claim for relief and whether an evidentiary hearing was required. Based on these arguments and the state court record subsequently supplied to the district court, the district court ordered an evidentiary hearing for April 10, 1981. In ordering this hearing, the district court implicitly held that the petition stated a claim for relief and only factual issues remained to be resolved. The district court later made this holding explicit when it stated: "It is a close question, but I was unable to find from the records before me prior to the hearing that petitioner's allegations raised legal questions only, or that assuming all factual allegations were true, that petitioner could not have prevailed as a matter of law." Record, vol. 1, at 52.
 
 
 [31]
 If petitioner had modified his petition by reciting "new" sentencing facts that materially changed the sentencing profile he had presented to the state collateral attack court, or if he had recited in his petition other relevant sentencing norms not recited to the state courts that allegedly demonstrated that his sentence was disparate, the state would no doubt have moved to dismiss his petition for want of exhaustion and the district court would have been compelled to dismiss on that ground. See the discussion of the third scenario in Part III supra
 
 
 [32]
 Alternatively, the court could have instructed counsel to proffer his mitigating evidence but did not do so. With a proffer in the record, the court could have engaged in the first step I have described above and found the petitioner's new sentencing profile
 
 
 [1]
 Order of District Court Denying Petition for Writ of Habeas Corpus and Continuing Stay for 48 Hours at 6 [hereinafter "order"]
 
 
 [2]
 Order at 7
 
 
 [3]
 Order at 15
 
 
 [4]
 In the same sentence the court concluded that such error did not constitute ineffective assistance of counsel. As the court itself noted, however, see order at 17, the court's application of law to facts is itself a conclusion of law. Thus, unlike its findings of fact (which this Court can overturn only if clearly erroneous), the district court's conclusions of law may be independently reviewed. This Circuit has followed this practice in cases involving claims of ineffective assistance of counsel, see, e.g., Baty v. Balkcom, 661 F.2d 391, 394 n. 7 (5th Cir. Unit B 1981) ("historical," or "pure," facts judged by clear error standard of review; appellate court applied own judgment, however, to ultimate determination of mixed question of fact and law as to whether counsel was effective), a practice which the Supreme Court explicitly approved in Pullman-Standard v. Swint, --- U.S. ----, 102 S.Ct. 1781, 1788 n. 16, 72 L.Ed.2d 66 (1982). Pullman-Standard did not alter the standard of review in cases involving questions of mixed fact and law; it held only that a finding of intent to discriminate under Title VII is a pure fact and is thus subject to the clear error standard of review
 
 
 [5]
 Order at 7
 
 
 [6]
 Id
 
 
 [7]
 Order at 14 (emphasis added)
 
 
 [8]
 Order at 15
 
 
 [9]
 Order at 6
 
 
 [10]
 Order at 7
 
 
 [11]
 Rehearing order at 1
 
 
 [12]
 As the district court noted in its earlier order, however, any mitigating evidence may be considered by a sentencing judge, whether or not it is specifically listed in the statute. Order at 10; Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978)
 
 
 [13]
 Because I conclude that the district court in effect found that counsel did not make a strategic choice, it obviously is not necessary to reach the question whether the strategy was unreasonable. I note, however, that for the strategy to be reasonable, the assumptions upon which it is based cannot be formed with no investigation at all. Powell v. Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932). Even in Gray v. Lucas, 677 F.2d 1086, 1093 (5th Cir.1982), a case which the majority cites as supporting the proposition that a strategic choice is sometimes permitted without investigation, see 693 F.2d at 1254-1255 & n. 20, the court found some investigation necessary before deciding not to pursue a certain line of defense: "Had [counsel] failed to [interview some of the witnesses], we might reach a different result." 677 F.2d at 1093
 
 
 [14]
 This conclusion may be reached by following either of two possible routes. The first is that the district court actually found that counsel's "decision" not to investigate was a non-strategic decision. This is indicated by the court's recitation of counsel's actual reason for not investigating (his feeling of hopelessness), which was in no way "strategic." In light of the fact that the district court did not state this fact in words of one syllable, as Judge Vance seems to want it to do, a second, though less simple, course is available. According to the Supreme Court in Pullman-Standard, supra, 102 S.Ct. at 1792, "where findings are infirm because of an erroneous view of the law, a remand is the proper course unless the record permits only one resolution of the factual issue." (emphasis added). The record in this case permits only the conclusion that counsel's non-action was not strategically motivated--as the district court's findings as to the real motivation for counsel's failure clearly suggest
 
 
 [15]
 Because the presentence investigation and information from other witnesses all tended to support the same line of defense, Tunkey's failure to request a presentence report should be considered in the same light as his failure to seek out supporting character witnesses
 
 
 [16]
 In finding ineffective assistance, a court need not necessarily impugn the general qualifications of the counsel in question. In the case of Mr. Tunkey, the record makes clear that, as a criminal attorney, he is eminently qualified and experienced. In this particular case, however, the district court notes that he was simply overwhelmed by the unique circumstances of his client's decision to plead guilty. See order at 15 n. 3. The issue before this Court is not the competence of Mr. Tunkey; it is only whether on this particular occasion counsel was effective. Cf. Gray v. Lucas, 677 F.2d 1086, 1094 (5th Cir.1982) (unique circumstance of non-cooperation by client does not negate attorney's duty to conduct independent investigation)
 
 
 [17]
 Judge Vance's recitation of facts that the district court must find seems to encompass more than just the question whether Tunkey's failure to investigate was the result of a strategic decision. Apparently, he would remand to determine: first, "[i]f ... there was more than one plausible line of defense in the case;" second, "if Tunkey made a strategic choice based upon reasonable assumptions to pursue one line of defense at the expense of another;" and third, "if that strategic choice was reasonable." 693 F.2d at 1258. As the above discussion indicates, the district court opinion already makes it abundantly clear that the court found that there was more than one plausible line of defense. It also concluded that counsel's inaction was not a result of strategy. Thus, it is irrelevant whether counsel's assumptions were reasonable, and whether the "strategic choice" was reasonable
 
 
 [18]
 See, e.g., order at 12, 14, 15, rehearing order at 1
 
 
 [19]
 See note 14 supra
 
 
 [1]
 I agree with Judges Tjoflat and Hill that the initial inquiry as to whether a defendant who has the assistance of a lawyer at a sentencing hearing has otherwise been constitutionally deprived should focus on how the defendant might have been prejudiced by that assistance, before examining whether what the lawyer did rendered him ineffective. I also agree with Judge Hill's observations concerning the impact of the affidavits upon which the majority has turned its decision
 
 
 [2]
 As Tunkey explained at the habeas corpus hearing:
 Q. You mentioned Judge Fuller would be more responsive to someone who pled guilty to the crimes.
 A. This is a very hard question to answer. But I think, as a trial attorney, I think that certainly one of the things which a trial attorney is responsible for is knowing, at least to some extent, the quirks and differences of opinion, political philosophy, philosophical approach to the law which varying judges demonstrate in their day-to-day activities.
 One particular facet of Judge Fuller's personality, if you will, as a Judge, was simply that it was my personal feeling that if a person were guilty and I preface it with that, that if a person were guilty and came before the Court and pled guilty as opposed to going to court and hoping to "beat the case" and then losing, that that person was going to get a lighter sentence.
 In other words, if there was a conviction obtained in either of the circumstances, that the person who pled guilty was more likely to get the lighter sentence. I am not saying that is right, but that was my personal opinion of the Judge at that time.
 
 
 [3]
 Tunkey testified:
 To myself, I certainly thought if David had any chance at all, and I am really getting subjective, in front of this particular Judge, on these particular facts for these particular kind of crimes, that the one shot he perhaps had was the fact that he genuinely was coming before the Court and admitting his guilt, unlike some defendants who come in and plead guilty to avoid a harsher punishment.
 Later in his testimony:
 Q. Do you think that Judge Fuller would have been concerned about a defendant's remorse?
 A. Oh, yes, I think that was all part and parcel of David's attitude in court and also to me out of court. That is why I had the strong feeling that this was the most important thing he had going for him. (Emphasis added).
 
 
 [4]
 That Tunkey was correct in his assessment of the sentencing judge is illustrated by the following excerpts from the guilty pleas hearing:
 THE DEFENDANT: I would like to say this. I believe the crime fits the punishment and I don't want to die. You understand what I am saying, but I say if I got to sit up in some jail and rot I would rather get the chair.
 THE COURT: We will resolve the question of punishment. I want you to be satisfied that I have a great deal of respect for people who are willing to step forward and admit their responsibility. That is not an automatic key to the door nor is it anything else.
 I am certainly satisfied you have been represented up to this point and will continue to be represented through Mr. Tunkey and I find him to be a very able and competent counsel and that you have had ample opportunity to discuss this matter with him, and in fact, are entering pleas in this case that take away from him the opportunity of really being a lawyer that he would like to be for you.
 But, I respect you for that and I think it speaks in your favor.
 There certainly is a factual basis for the Court to accept your pleas in this case and on that basis I will do so.
 (Emphasis added).
 
 
 [5]
 The district court concluded that "reviewing the proposed character and psychiatric testimony, and weighing it against the detailed record of petitioner's conduct initiating and carrying out three separate episodes of planned robbery, kidnapping and murder, there does not appear to be a likelihood, or even a significant possibility that the balancing of aggravating against mitigating circumstances under the Florida death penalty statute would have been altered in petitioner's favor."
 
 
 [1]
 I agree with Judge Roney's analysis of the prejudice requirement and am satisfied with the standard set out in United States v. Decoster, 624 F.2d 196 (D.C.Cir.) (en banc), cert. denied, 444 U.S. 944, 100 S.Ct. 302, 62 L.Ed.2d 311 (1979), but find little difference in this standard and that derived from United States v. Frady, 456 U.S. 152, 173, 102 S.Ct. 1584, 1596, 71 L.Ed.2d 816 (1982)